UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/5/19

―――――――――――――――――――――――――

THE BARTER HOUSE, INC., and BRIAN DIMARCO,

Plaintiffs,

-v-

INFINITY SPIRITS, LLC, *a limited liability company*,
DON GOOD TEQUILA COMPANY, LLC, *a limited
liability company*, EUROPEAN INFINITY GROUP,
INC., *a corporation*, and BRIAN HOPKINS, *an
individual*,

Defendants.

―――――――――――――――――――――――――

17 Civ. 9276 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs The Barter House, Inc. ("Barter House"), a liquor importer and wholesaler, and

Brian DiMarco, its founder, bring this action against Infinity Spirits, LLC ("Infinity Spirits"),

European Infinity Group, Inc. ("EIG"), Don Good Tequila Company, LLC ("DGT"), and Brian

Hopkins. Plaintiffs bring common law claims that Hopkins, acting through the other corporate

entity defendants, fraudulently induced them to enter into a partnership to sell and market the

tequila brand Blue Hour Tequila or La Hora Azul ("Blue Hour Tequila"). Plaintiffs also claim

that defendants breached a Stake Hold Agreement, under which DiMarco was to be granted an

ownership stake in Infinity Spirits. EIG counterclaims against both plaintiffs for breach of a

Distribution Agreement, asserting that plaintiffs breached contractual obligations with respect to

the promotion of Blue Hour Tequila, and against DiMarco for tortious interference with that

agreement as between EIG and Barter House. The Court has entered default judgment as to

liability against DGT, Dkt. 85, but, with discovery complete, all other claims remain unresolved.

1

Pending now are cross-motions for summary judgment. The remaining defendants seek summary judgment on all of plaintiffs' claims, and EIG seeks summary judgment on its breach of contract counterclaim. Plaintiffs cross-move for partial summary judgment on their breach of contract claim.

For the following reasons, the Court denies both motions in their entirety. The Court recognizes, however, that although summary judgment cannot be granted to plaintiffs on their breach of contract claim, which seeks to recoup funds plaintiffs contributed towards the Stake Hold Agreement, but which defendants unjustifiably retained and never returned, it is certain that plaintiffs will ultimately obtain such relief either under that claim or on plaintiffs' parallel quasi contract claim.

The Court separately vacates an Order it had issued, at the invitation of defense counsel, directing Hopkins and other defendants to place certain funds in escrow to preserve plaintiffs' ability to recoup the funds they had contributed towards the Stake Hold Agreement. The Court does so based on convincing evidence that defense counsel's offer was made without his client's authorization. The Court commissions prompt briefing, however, on whether, with the Court having now determined that plaintiffs will be entitled to return of these funds, an order should issue directing that defendant(s) place an appropriate sum in escrow.

## I.    Background

### A.    Factual Background[1]

#### 1.    Initial Dealings Between Hopkins and DiMarco

In early 2016, Hopkins and DiMarco began discussing the possibility of DiMarco acting as the exclusive distributor for Blue Hour Tequila in the United States. Def. 56.1 ¶ 4. Hopkins

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions on the motion for summary judgment, including each party's Statement Pursuant to Local Civil

and DiMarco engaged in negotiations via phone, email, and in person in Toronto, Canada. *Id.*
¶ 5. DiMarco was told that Hopkins was unable to travel to the United States, so DiMarco
sometimes travelled to Canada to negotiate with Hopkins. *Id.* ¶¶ 6–7.

Relevant to DiMarco's fraud claim, in negotiating with Hopkins, DiMarco knew that
Hopkins had a criminal record, Felicello Decl. Ex. 17 ("Hopkins Dep.") at 12–13,[2] and soon
formed the judgment that Hopkins was also "a pathological liar" and "a bad drunk and prone to
boisterous outbursts," *id.* Ex. 18 ("DiMarco Dep.") at 33–34.[3] Nevertheless, DiMarco

---

Rule 56.1, Dkt. 188 ("Def. 56.1"), *see* Dkt. 200 at 7–13 ("Pl. 56.1"), as well as plaintiffs'
counter-statement, *see* Dkt. 200 at 1–7 ("Pl. Counter 56.1"); the declarations of Brian Hopkins,
Dkt. 189 ("Hopkins Decl."), and Andy Oh, Esq., Dkt. 190 ("Oh Decl."), in support of
defendants' motion, and attached exhibits; the declarations of Brian DiMarco, Dkt. 202
("DiMarco Decl."), and Rosanne Felicello, Esq., Dkt. 203 ("Felicello Decl."), in support of
plaintiffs' motion, and attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When
facts stated in a party's 56.1 statement are supported by testimonial or documentary evidence and
not denied by the other party, or denied by a party without citation to conflicting admissible
evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each
numbered paragraph in the statement of material facts set forth in the statement required to be
served by the moving party will be deemed to be admitted for purposes of the motion unless
specifically controverted by a correspondingly numbered paragraph in the statement required to
be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent
. . . controverting any statement of material fact[] must be followed by citation to evidence which
would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Because defendants did not respond to plaintiffs' 56.1 statement, Dkt. 200, to the extent the facts
set forth in that statement are supported by admissible evidence in the record, the Court deems
them admitted. *See* Pl. Reply at 12–13.

[2] Hopkins testified that his criminal record includes "[a] DUI and assaults," including two DUIs
from when he was approximately 18 and 28 years old. Hopkins Dep. at 12–13. He testified that
an assault was "[a]ssault with a weapon," specifically "[a] tire iron," when he was 19 years old.
*Id.* at 13.

[3] DiMarco knew about Hopkins' criminal record from the newspapers, and Hopkins confirmed it
when questioned by DiMarco. *See* DiMarco Dep. at 34. DiMarco formed the opinion that
Hopkins was a pathological liar within about a month of knowing him based on Hopkins' lies
about his assets and about meeting celebrities at restaurants. *Id.* at 35.

concluded, including based on the group surrounding Hopkins, that "possibly he was an entrepreneurial spirit" and, despite wariness in trusting Hopkins, "as an entrepreneur myself, I thought I can figure this out." *Id.* at 33–34. DiMarco explained that:

> Part of the psychology of why I have been successful as an entrepreneur is I arrogantly believe I could put my head in the lion's mouth and I will be okay, and because I have dealt with a lot of interesting folks in my life in this business, sometimes it takes a character like Brian Hopkins to create something that I believe was a great product. Sometimes those people, despite themselves, have found gold. Many times, I found it to be true in my life. Some of the most unsavory folks can be some of the most interesting and creative and challenging individuals. I almost—now, with the hindsight, I see it is arrogance on my part, but at the time, I thought I can manage this guy. That is heartfelt. That is really how I felt about it. Like I can manage this guy.

*Id.* at 48–49. DiMarco testified that, after confronting Hopkins about certain lies, he told Hopkins that Hopkins' "product will be successful despite you, because it is great, and you surrounded yourself with some good people. I am willing to take a chance because I think this thing could be good if you will listen to us and let us help you." *Id.* at 36.

### 2. Initial Agreements Entered Into Between Hopkins and DiMarco

Hopkins and DiMarco thereafter entered into a series of agreements, as follows.

On or about March 3, 2016, Hopkins, on behalf of DGT, and DiMarco, on behalf of Barter House, entered into two nearly identical agreements, each titled a "Performance and [F]uture Equity Participation Agreement." Pl. 56.1 ¶ 29; DiMarco Decl. Exs. 2 & 3. One agreement provides that:

> In furtherance of the execution of the La Hora Azul Distribution [A]greement of even date by . . . Don Good Tequila Company of Mexico and you (the "Distribution Agreement") relating to defined US territories (initially a few US states and as expanded from time to time), I confirm the following equity participation rights in Topco of the Don Good Tequila Group ("DGT USA") are hereby granted as set forth below.

DiMarco Decl. Ex. 2. The second agreement contains the same language save that the product in which it grants rights is "Blue Hour Tequila ('DGT USA')" as opposed to "Topco of the Don Good Tequila Group ('DGT USA')." *Id.* Ex. 3.

On or about April 26, 2016, Hopkins provided Barter House a Letter of Appointment that appoints Barter House as "sole United States Importer and brand agent" for the three Blue Hour Tequila brands. DiMarco Decl. Ex. 4 ("Letter of Appointment"); Pl. 56.1 ¶ 32. Hopkins signed the letter as "Director, Don Good Tequila Company, 1712 Pioneer Ave Cheyenne WY 82001." Letter of Appointment; Hopkins Dep. at 86–87.

On or about April 28, 2016, DiMarco, on behalf of Barter House, and Hopkins, on behalf of EIG, entered into a "Letter of Offering" which gave Barter House "the opportunity to participate in funding of the acquisition of the Distillery and Hacienda called 'Hacienda y Destileria La Providencia[,'] situated in Arenal, Jalisco, Mexico." DiMarco Decl. Ex. 5 ("Letter of Offering"); Pl. 56.1 ¶ 34. The Letter of Offering offers Barter House 4.9% of the corporation under which the real property would be held in exchange for $50,000 USD. *See* Letter of Offering. It provides that "[d]uring the 4 months due diligent period, if the purchase of the property does not close, [EIG] will: [r]eturn the $50,000USD to Barterhouse [sic], or [c]redit against Barterhouse's account[.]" *Id.*

On or about April 30, 2016, Barter House sent $50,000 by wire transfer to EIG. DiMarco Decl. Ex. 6 (wire transfer receipt). The "Purpose of Wire" was listed as "Investment" and under "Purpose: Additional Info" was written "HACIENDA." *Id.* Hopkins testified that Barter House paid the $50,000 contemplated by the Letter of Offering and that this $50,000 was credited against DiMarco's share in Infinity Spirits under an agreement entered into later—the Stake Hold Agreement. Hopkins Dep. at 104–07.

5

In June 2016, DiMarco notified Hopkins via email that Barter House was registering the Blue Hour Tequila brand in Florida. Felicello Decl. Ex. 20 (June 9, 2016 email from DiMarco to Hopkins).

From on or about July 2016 to January 2017, Barter House organized or attended various events to promote Blue Hour tequila. Pl. 56.1 ¶ 48; DiMarco Decl. Exs. 10, 11, 12.

### 3. The Distribution Agreement

In or about July 2016, Barter House and EIG started negotiating, Hopkins Dep. at 56, and in November 2016, entered into, a distribution agreement that granted Barter House the exclusive right to import, distribute, sell, and market Blue Hour Tequila in "the Territory," Def. 56.1 ¶ 11; Pl. Counter 56.1 ¶ 11; Oh Decl. Ex. E ("Distribution Agreement") § 3.1. The "Territory" is defined in the Distribution Agreement as

> [t]he territories of **NEW YORK STATE (1 State in USA)**. Other states considered for distribution must be agreed to by [EIG] upon commercial proposal from [Barter House] with a minimum 30 days consideration prior to export/distribution, and excluding Duty Free channels in the country.

Distribution Agreement § 2.

Barter House thereafter worked with distributors for the sale of Blue Hour Tequila products in states other than New York, and facilitated sales in Connecticut, Florida, Kentucky, and Tennessee. Def. 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17. Hopkins prepared, signed, and sent Hopkins a Sole Source Letter for Tennessee, designating Barter House as EIG's distributor for that state. Def. 56.1 ¶ 16; Pl. Counter 56.1 ¶ 16. The parties dispute, however, whether Barter House was authorized to distribute for EIG in states other than New York and Tennessee. Def. 56.1 ¶¶ 14–17; Pl. Counter 56.1 ¶¶ 14–17.[4]

---

[4] DiMarco testified that, after the Distribution Agreement became effective, he didn't open any new markets, DiMarco Dep. at 59–60, and never sold Blue Hour Tequila in Minnesota or Texas, Def. 56.1 ¶¶ 18, 19.

The Distribution Agreement provides that "[u]pon signing of this Agreement, [Barter House] shall order a minimum of 500 Cases of [Blue Hour Tequila] Products." Distribution Agreement § 5.1.5. It provides that Barter House "agrees to buy the Annual Case/Volume Target of Product in each Contract Year as set out in Appendix 1," *id.* § 4.1.1, and that "[Barter House] and [EIG] each agrees that the terms of this agreement relating to the Annual Case/Volume Targets do not impose any obligations on [Barter House] to purchase, sell or have sold any quantity of Product but are used solely to provide the extension and termination rights set forth in Section 8," *id.* § 3.1.8. The Distribution Agreement states that it is governed by the laws of Ontario, Canada, and that the forum for any dispute would be in a court located there. *Id.* §§ 9.1.1, 9.1.6, 21.1.1.

On or about December 7, 2016, a representative from DGT sent instructions to DiMarco, copying certain DGT representatives, with forms for applying for a license to transport liquor into Kentucky. DiMarco Decl. Ex. 7.

### 4. The Stake Hold Agreement

In January 2017, DiMarco and Infinity Spirits entered into a Stake Hold Agreement. Def. 56.1 ¶ 24; DiMarco Decl. Ex. 1 ("Stake Hold Agreement"). The Stake Hold Agreement required DiMarco to pay $250,000 in exchange for which he would receive a 2.5% equity share in Infinity Spirits. Def. 56.1 ¶ 25; Pl. Counter 56.1 ¶ 25. On or about January 25, 2017, Barter House sent $27,500 by wire transfer to EIG. DiMarco Decl. Ex. 9 (wire receipt). The "Purpose of Wire" is listed as "Pay Invoice," and under "Purpose: Additional Info" appears "BLUE HOUR TEQUILA JAN 17 ORDER." *Id.* Hopkins testified that EIG received this wire and credited it towards DiMarco's stake in Infinity Spirits. Hopkins Dep. at 108.

### 5. Termination of the Distribution Agreement

On or about August 14, 2017, Hopkins, on behalf of EIG, sent DiMarco, on behalf of Barter House, a notice to terminate the Distribution Agreement, stating that the termination had been effective May 17, 2017. DiMarco Decl. Ex. 16. Although by this date—as developed further below—DiMarco had made some payments under the Stake Hold Agreement, Barter House and EIG ended their business relationship before DiMarco had fully paid the $250,000 required under that agreement to obtain a 2.5% equity interest in EIG. Def. 56.1 ¶ 28; Pl. Counter 56.1 ¶ 28.

### B. Procedural History

The procedural history of this litigation is complex. The litigation has been fractious. In particular, defendants have repeatedly changed counsel, attempted to relitigate decisions, and, after discovery closed, attempted to reopen it. In the interest of completeness, and because various areas of dispute bear on one or more summary judgment motions or related issues, the Court reviews this history in detail. Although the following account is largely chronological, the Court takes certain events out of order in the interest of clarity.

### 1. Removal to this Court

On November 2, 2017, Barter House filed a Complaint against Infinity Spirits in New York State Supreme Court, County of New York. Dkt. 1-1. On November 28, 2017, Infinity Spirits removed to federal court based on diversity jurisdiction, because Infinity Spirits consists of two members both of whom reside in Ontario, Canada. Dkt. 1.

On December 1, 2017, Infinity Spirits moved to dismiss, claiming that Barter House lacked standing, because the Stake Hold Agreement that was the subject of the Complaint's breach of contract claim had been entered into in DiMarco's personal capacity, whereas the Complaint named only Barter House as a plaintiff. Dkt. 3. On January 16, 2018, Barter House

filed a First Amended Complaint adding DiMarco as a plaintiff and adding Hopkins, DGT, and EIG as defendants. Dkt. 16 ("FAC").

### 2. Motions for Default Judgment

On March 5, 2018, the Court held an initial conference at which plaintiffs and, among defendants, only Infinity Spirits were present. At that conference, the Court issued a case management plan and scheduling order with fact discovery to close on July 31, 2018. Dkt. 34. On March 20, 2018, at the request of the parties, the Court, having earlier referred the case to Magistrate Judge Pitman for settlement, Dkt. 33, adjourned the deadline for fact discovery to October 31, 2018 to facilitate settlement discussions. Dkt. 36. On March 23, 2018, Infinity Spirits' attorney, John R. Lane, Esq., and his law firm, moved to withdraw from representing Infinity Spirits. Dkt. 37. On April 6, 2018, the Clerk of Court issued certificates of default against all defendants except Infinity Spirits. Dkts. 48–50. On April 10, 2018, after an allegation of bad faith against defendants, the Court granted plaintiffs' request to withdraw the referral for settlement discussions, and moved the fact discovery deadline to July 2, 2018. Dkt. 52. On April 26, 2018, the Clerk of Court issued a certificate of default against Infinity Spirits, which, following its attorney's withdrawal, was unrepresented. Dkt. 55.

On June 11, 2018, plaintiffs moved for default judgment against all defendants. Dkts. 59–62. On June 15, 2018, Todd Wengrovsky, Esq., entered an appearance on behalf of Infinity Spirits, EIG, and Hopkins, Dkt. 67, and moved to vacate the above certificates of default, Dkts. 68, 71. At a hearing on August 2, 2018, after numerous contentious submissions, the Court denied plaintiffs' default judgment motions and vacated the certificates of default as to all

defendants except DGT.[5] Dkt. 84. But, the Court required that Hopkins and his wife be deposed on specific dates in New York. *Id.* The Court directed Mr. Wengrovsky to inform defendants that:

> [T]he reason I am electing not to enforce a default judgment [is] based on my understanding that your clients were coming to New York to cooperate with the litigation in this case on the merits.
>
> In the event your clients elect not to participate in the deposition in New York, I will reconsider the decision not to grant the default. The reason I am allowing you to litigate this on the merits is because of my preference and the Circuit's preference . . . that cases get litigated on the merits, but I'm not blind to the history here. Your clients have been disrespectful of the system. They've jerked around the plaintiff. They've imposed a lot of costs. Under the circumstances, it seems to me a fair condition that if they want to litigate this on the merits that they have to move more than halfway, that means showing up in New York to be deposed.

Dkt. 97 at 15–16.

### 3.    Deposition Disputes

On August 20, 2018, plaintiffs reported that Hopkins, apparently due to restrictions flowing from his criminal record, was unable to travel to the United States, and that the parties could not agree on who should bear plaintiffs' costs for travel to Toronto, where Hopkins is located. *See* Dkt. 94; *see also* Dkt. 95 (defense response). On August 22, 2018, the Court ordered that Hopkins' deposition take place in Toronto on August 28, 2018 and that defendants bear reasonable costs associated with necessary travel. Dkt. 96. The Court later extended the time to depose Hopkins and DiMarco until September 21, 2018. Dkt. 108.[6]

---

[5] At the default judgment hearing, counsel for the other defendants represented that DGT had been dissolved. Dkt. 97 at 2 ("The fourth defendant[, DGT,] has actually been dissolved in the state of Wyoming.").

[6] On September 17, 2018, plaintiffs deposed Hopkins. Dkt. 119 at 4. On October 11, 2018, plaintiffs moved to compel defendants to pay deposition-related expenses pursuant to the Court's August 22, 2018 Order, Dkt. 127; EIG filed a letter in response, Dkt. 136. At an October 19, 2018 hearing, the Court granted plaintiffs' motion to compel and ordered defendants to pay plaintiffs' counsel, Rosanne Felicello, Esq., the deposition costs she requested by October 24,

### 4. Efforts to Secure Hopkins' Presence in the United States

On October 24, 2018, at defendants' request, the Court signed a letter for Hopkins to use to facilitate his entry into the United States to enable him to assist his counsel in the litigation, specifically in connection with summary judgment submissions. Dkt. 145. On November 29, 2018, after further discussion with counsel at a conference on this subject, *see See* Dkt. 181 ("Nov. 19, 2018 Hrg. Tr.") at 37–41, the Court issued an Order requiring Hopkins' presence at court proceedings, *see* Dkt. 179.

### 5. Counterclaims and the Ontario Action

On August 6, 2018, the Court approved a new case management plan setting the close of fact discovery for September 14, 2018. Dkt. 87. Also on August 6, 2018, Infinity Spirits, EIG, and Hopkins collectively answered. Dkt. 88.

On August 16, 2018, EIG, without notice to the Court or opposing counsel, filed an action in Ontario that sought, from a Canadian court, an anti-suit injunction blocking this litigation. *See* Dkt. 99-2. On August 17, 2018, a new lawyer, Abraham Lichy, Esq., appeared for EIG, Dkt. 89, and on August 20, 2018, Mr. Wengrovsky, withdrew as EIG's counsel, while remaining counsel for Infinity Spirits and Hopkins, Dkt. 96. By letter dated August 21, 2017, Mr. Wengrovsky notified the Court that EIG had filed a claim against plaintiffs in Ontario court. *See* Dkt. 95.

---

2018, "with any dispute over specific items to be made after payment has been effected," and a daily penalty to be imposed for failure to pay. Dkt. 138. On October 29, 2018, plaintiffs filed a second letter motion to compel such payment. Dkt. 146. After defense counsel represented in a letter filed October 31, 2018, Dkt. 151, that the expenses had been paid and apologized for the delay, the Court accepted the late payment and waived the daily penalty, Dkt. 155.

*a.* *The Counterclaims*

On August 27, 2018, EIG moved for leave to file an amended answer that would include the affirmative defense of improper venue as well as counterclaims. Dkt. 99. On August 30, 2018, after receiving plaintiffs' opposition letter, Dkt. 101, and a reply from EIG, Dkt. 102, the Court granted EIG leave to amend its answer, provided that such amendment did not extend discovery, *see* Dkt. 103. On August 31, 2018, EIG filed an Amended Answer with counterclaims. Dkt. 104 ("EIG Answer").

On September 14, 2018, fact discovery closed. On September 24, 2018, the Court granted plaintiffs until September 28, 2018 to answer EIG's counterclaims. Dkt. 110.

On September 25, 2018, Mr. Lichy, EIG's counsel, moved to withdraw on account of "irreconcilable differences" with his client. Dkt. 111 at 1. The Court gave EIG two weeks to find new counsel. Dkt. 112. On September 28, 2018, Mr. Lichy filed another letter requesting immediate withdrawal and attaching a letter from Hopkins in which Mr. Lichy highlighted the "complete breakdown in communication and irreconcilable differences between me and my client." Dkt. 114 at 1. Hopkins' letter complained, *inter alia*, that "Lichy has lead us down a wrong path" and "is not acting in our best interest" and that plaintiffs' lead counsel "has painted a picture about us and we have not been the ones delaying the case." Dkt. 114-1 at 1–2. On September 28, 2018, the Court denied Mr. Lichy's request to withdraw for the time being, but stated that it would "be compelled to entertain a motion by plaintiff's counsel for entry of default judgment as to EIG, on account of its failure to defend this lawsuit," if EIG did not retain new counsel by the date the Court had set. Dkt. 115.

On September 28, 2018, plaintiffs answered EIG's counterclaims. Dkt. 116.

*b.* *The Anti-Suit Injunction*

On October 9, 2018, plaintiffs filed an Order to Show Cause seeking a temporary restraining order enjoining EIG from maintaining the Ontario action until a hearing could be held, and an eventual anti-suit injunction against the Ontario action. Dkts. 117–120. Plaintiffs stated that, because EIG had served DiMarco in the Ontario action at DiMarco's deposition on September 21, 2018, plaintiffs were required to respond in that action on October 31, 2018. *See* Dkt. 117. Plaintiffs sought to enjoin EIG from pursuing that action before plaintiffs could be held there in default.

On October 10, 2018, the deadline for EIG to retain new counsel, Andy Oh, Esq., appeared on EIG's behalf, Dkt. 122, and Mr. Lichy again moved to withdraw from representing EIG, Dkt. 121, which the Court granted, Dkt. 124. Later, on October 31, 2018, Mr. Oh entered an appearance on behalf of EIG, Infinity Spirits, and Hopkins, Dkt. 148, and the Court thereupon granted Mr. Wengrovsky's motion to withdraw as counsel for his two remaining clients, Infinity Spirits and Hopkins, Dkt. 152.

On October 11, 2018, the Court issued the Order to Show Cause, temporarily enjoined EIG from pursuing the Ontario action, scheduled a hearing for October 19, 2018, and ordered a written response from EIG. See Dkts. 125, 128. On October 16, 2018, EIG filed an opposition to the preliminary injunction and moved to dismiss its counterclaims in this action without prejudice. Dkt. 132.

i.      The October 19, 2018 Hearing

On October 19, 2018, the Court held a hearing and heard argument on plaintiffs' anti-suit injunction. The Court addressed with counsel, *inter alia*, why, given the extensive history of the case, defendants had never challenged personal jurisdiction or venue. Dkt. 161 ("Oct. 19, 2018 Hrg. Tr.") at 25–31. The Court then issued a bench decision enjoining EIG from pursuing the

13

Ontario action and denying EIG's motion to dismiss its counterclaims.[7] Later that day, the Court

issued an Order "enjoin[ing] defendant EIG from pursuing the Ontario action, CV-18-00603407-

000, in the Ontario Superior Court of Justice." Dkt. 138 ("Oct. 19, 2018 Order").

On October 22, 2018, EIG filed a letter motion for reconsideration of that order, correctly

noting that, contrary to a joint representation that both Mr. Oh and Ms. Felicello had made at the

October 19, 2018 hearing, *see* Oct. 19, 2018 Hrg. Tr. at 9–15, the Court had been informed by

the defense, before plaintiffs' filing of the Order to Show Cause, of the Ontario action,

specifically at the time EIG moved to amend its answer to add counterclaims. Dkt. 140.

Notwithstanding this correction, the Court denied EIG's motion on October 23, 2018, finding

that

> [t]his error does not . . . affect the Court's decision to grant plaintiffs' application
> for a preliminary injunction enjoining EIG from pursuing its claims in the Ontario
> action, which claims parallel EIG's counterclaims here. The Court's ruling, as the
> transcript reflects, turned on the extraordinary inefficiency, delay, and wasteful
> duplication caused by litigating substantively the same claims in different fora in
> different countries on different timetables. As the Court repeatedly emphasized,
> with discovery having closed in this case and with this case ready to proceed to
> summary judgment and/or trial, allowing EIG to pursue the same claims in Ontario,
> including commencing discovery in that proceeding, would be wasteful and
> duplicative. EIG made the strategic decision to pursue these counterclaims in this
> District, and have them resolved here on the merits. The Court will hold EIG to
> that decision. For avoidance of doubt, the Court again finds that the threshold
> requirements for an anti-suit injunction have been met, and that the *China Trade*
> factors still weigh heavily in favor of enjoining the Ontario action.

Dkt. 141 at 1–2.

On November 1, 2018, the Court granted Mr. Oh's motion to terminate Thompson &

Knight LLP, his previous office, as counsel of record for EIG and Hopkins, and to preserve Mr.

---

[7] The Court gave EIG an opportunity to dismiss its counterclaims in this action *with* prejudice,
with the understanding that doing so would also bar such claims in Canada. EIG declined. Oct.
19, 2018 Hrg. Tr. at 41:3–11.

Oh, now operating a solo law practice, as counsel of record. Dkt. 154. From November 1, 2018 forward, Mr. Oh alone has represented EIG, Infinity Spirits, and Hopkins.

ii.     The December 10, 2018 Hearing

On November 19, 2018, at a pre-motion conference on the instant cross-motions for summary judgment, *see infra* p. 17, plaintiffs raised a concern that EIG had failed to comply with the Court's Oct. 19, 2018 Order enjoining it from pursuing the Ontario action. *See* Nov. 19, 2018 Hrg. Tr." at 41–42. On November 20, 2018, plaintiffs filed a proposed order, per the Court's instruction, *see id.* at 42, that would order EIG to "take any and all necessary steps to withdraw the pending Ontario action within five days of the entry of this Order," award $5,000 in sanctions against EIG, and provide for $1,000 per day in fines for continued noncompliance, Dkt. 169. EIG, opposing the proposed order, filed a letter stating that it refused to withdraw the Ontario action, that it would "continue to follow the [Oct. 19, 2018] Order, under which [EIG] is required to 'not pursue' the Ontario action. That is not defiance; it is strict compliance." Dkt. 167. On November 26, 2018, the Court ordered EIG to "take any and all necessary steps to discontinue the pending Ontario action within five business days," stating that EIG would be held in contempt with sanctions of $100 per day for noncompliance. Dkt. 170 ("Nov. 26, 2018 Order").

On November 27, 2018, EIG filed a letter asking the Court to reconsider this ruling, drawing a distinction between the Oct. 19, 2018 Order's directive that EIG "not pursue" the Ontario action, and the Nov. 26, 2018 Order directing it to "discontinue" that action. Dkt. 171. The Court granted the motion, agreeing that "further attention is warranted as to the most efficacious means of assuring that EIG's Ontario action does not ever proceed, given this parallel action," and scheduled argument for December 3, 2018 on this issue. Dkt. 172. The Court accordingly stayed the sanctions component of its Nov. 26, 2018 Order. *Id.* On November 29,

2018, the Court, at EIG's request, adjourned the December 3, 2018 hearing by one week, to enable Hopkins to attend. Dkt. 180.

At the December 10, 2018 hearing, the Court and counsel discussed how to assure that EIG not pursue the Ontario action. The Court ultimately ordered the parties to "jointly move to stay the Ontario Action in full until the entry of a final judgment in this case," and set a deadline of December 20, 2018 for the parties to so move. Dkt. 192.

### 6. Second Amended Complaint

On November 2, 2018, plaintiffs moved for leave to file a Second Amended Complaint that would add a new defendant: Luna Global Spirits LLC. Dkt. 156. Plaintiffs alleged that Hopkins controlled this entity and, when deposed on September 17, 2018, had testified that Luna Global Spirits LLC held trademarks for Blue Hour Tequila. *See id.* On November 8, 2018, defendants opposed the motion. Dkt. 158. On November 13, 2018, the Court denied leave to amend, finding the request too late, with discovery having closed and the case poised to move to summary judgment or trial. Dkt. 160.

### 7. The Instant Summary Judgment Motions

On November 9, 2018, defendants filed a letter seeking leave to move for summary judgment and previewing their arguments. Dkt. 159. On November 15, 2018, plaintiffs opposed that motion, while stating that, if defendants so moved, they would move for partial summary judgment. Dkt. 164. On November 19, 2018, the Court held a pre-motion conference and set a briefing schedule. *See* Dkt. 165.

On December 7, 2018, defendants filed a motion for summary judgment, Dkt. 186, a memorandum of law, Dkt. 187 ("Def. Mem."), a Rule 56.1 Statement of Facts, Dkt. 188, and declarations from Hopkins, Dkt. 189, and Mr. Oh, Dkt. 190, with exhibits. On December 21, 2018, plaintiffs filed a motion for partial summary judgment, Dkt. 199, a memorandum of law,

Dkt. 201 ("Pl. Mem."), a Rule 56.1 Counter Statement of Facts and Statement of Additional Facts, Dkt. 200, and declarations from DiMarco, Dkt. 202, and Ms. Felicello, Dkt. 203, with exhibits. On January 7, 2019, defendants filed a combined opposition and reply memorandum of law. Dkt. 208 ("Def. Reply"). On January 21, 2019, plaintiffs filed a reply including their opposition to defendants' letters at Dkts. 206 and 207. Dkt. 213 ("Pl. Reply"); *see also infra* p. 20.

On February 12, 2019, the Court heard argument on the summary judgment motions. Dkt. 259 ("Feb. 12, 2019 Hrg. Tr."). During argument, the Court indicated its intent to consider numerous post-briefing letters from defendants concerning a discrete argument that had been made about liquor licensing, and authorized plaintiffs to respond in a supplemental brief. *See infra* p. 24. On February 20, 2019, plaintiffs filed such a brief. Dkt. 240.

### 8.    Efforts to Supplement the Summary Judgment Record

After discovery closed, defendants continued to solicit and receive documents from third parties. These related, in particular, to Sole Source letters authorizing plaintiffs to distribute defendants' liquor in various states, which defendants contend they did not authorize and/or contained forged signatures. These also related to whether plaintiffs, in distributing defendants' products, had an appropriate liquor license, and whether this fact was relevant to the claims at issue in this case. Following discovery, plaintiffs, for their part, challenged defendants' failure to produce documents demanded during Hopkins' deposition. While a formidable proliferation of submissions was made on these issues, these filings can be distilled as follows.

At the November 19, 2018 conference, plaintiffs informed the Court that certain third parties had told plaintiffs that they had received litigation-hold letters from Mr. Oh. *See* Nov. 19, 2018 Hrg. Tr. at 42–46. While noting that discovery had closed, the Court did not fault the sending of litigation hold letters. Mr. Oh had appeared late as counsel, the Court noted, and

17

could validly request that third parties preserve documents so as to remain available for use at trial, if the Court later ordered their production. *See id.* at 42–43. But, to ensure that such letters did not wrongly imply that any third party was obliged to produce such documents, the Court ordered that, before sending any such letters to a third party, defense counsel was first to send a draft to opposing counsel for review. *Id.* at 45.

On December 6, 2018, plaintiffs moved for sanctions on the grounds that (1) defendants' counsel had not sent plaintiffs' counsel copies of previously-sent litigation hold notices; (2) the day after the conference, November 20, 2018, defense counsel had sent two letters to third parties, each stated that the third party "should" preserve documents; and (3) plaintiffs had received notice from a third party, T. Elenteny Holdings, LLC ("Elenteny"), that Mr. Oh had emailed it on December 4, 2018, requesting not merely preservation, but production of emails in connection with this litigation, notwithstanding the close of fact discovery. Dkt. 185.

On December 10, 2018, defendants responded that it had now sent plaintiffs the litigation hold letters at issue and that its use of the word "should" had been proper. Dkt. 191. Defendants further represented that one litigation hold letter had resulted in production by the recipient, the entity Park Street, to defense counsel of an email chain that defense counsel asserted was probative. *See id.* It appeared that, on Sunday, November 18, 2018, at approximately 3 p.m. CST, Mr. Oh had emailed a litigation hold to Park Street stating that it was under a "duty to preserve" certain documents. *See* Dkt. 191-4 at 1–2. At approximately 4 p.m. CST the same day, Hopkins had forwarded this email to Park Street's general manager Nino Serafini, along with the email message, "fyi will call you Monday[.]" *Id.* at 1. On November 28, 2018, Mr. Serafini furnished Mr. Oh and Hopkins with a responsive document—"the [email] chain where [defense counsel] received the Blue Hour authorization letters from Evolution Spirits." *Id.*

Defendants further claimed that (1) the email chain and attachments revealed that DiMarco had doctored a Sole Source letter; (2) plaintiffs had not produced the email chain in discovery; (3) defendants believed DiMarco had doctored other Sole Source letters; and (4) DiMarco, in his deposition, had attested that he had never seen the Sole Source letter in question and that the email chain appeared to disprove this testimony. *See* Dkt. 191 at 2–3.

On December 14, 2018, in a reply letter, plaintiffs denied having attempted to hide the Sole Source letter. Dkt. 193 at 1. The letter, they noted, had been used in DiMarco's deposition, and plaintiffs claimed to have produced the email chain on September 20, 2018, in discovery sent to Mr. Oh's predecessor counsel. *Id.*[8]

On December 18, 2018, defendants filed a letter raising a new issue. They represented that while Hopkins had been in New York City for the December 10, 2018 hearing on the anti-suit injunction, he had been "able to speak" to persons in the liquor industry and with the New York State Liquor Authority ("SLA"). Dkt. 196 at 1. Defendants claimed that Hopkins' discussion with the SLA revealed that neither DiMarco nor Barter House had had the appropriate liquor license to enter into the Distribution Agreement, which was the basis for defendants' counterclaims, and now of defendants' summary judgment motion. *See id.* The letter also reprised defendants' claim that the Sole Source letter relating to liquor distribution in Florida had been fabricated. *See id.* at 2–5. Attached was a declaration from Hopkins denying that he had given plaintiffs a Sole Source letter authorizing plaintiffs to distribute EIG's liquor in New Jersey, Connecticut, Florida, Texas, Washington D.C., or Minnesota, *see* Dkt. 196-1 at 1–3. Also attached was a letter from Hopkins to a Kayla O'Donnell, apparently a lawyer at the SLA,

---

[8] Plaintiffs acknowledged that they had inadvertently omitted the Tennessee Sole Source letter from a reproduction of discovery furnished to Mr. Oh after he joined the case, but that they had recently corrected this error. Dkt. 193.

that purported to summarize a conversation they had about Barter House and DiMarco's liquor license. *Id.* at 4–5. Defendants requested "an immediate hearing to determine the status, if any, of Plaintiffs' ability to distribute Blue Hour Tequila in New York State," Dkt. 196 at 1, and an order compelling plaintiffs to produce any Sole Source letters signed by Hopkins and accompanying correspondence. *See id.* at 3.

On December 28, 2018, after receiving a letter from plaintiffs disputing defendants' allegations, Dkt. 198, the Court granted defendants leave to file a letter submission addressing the licensing issue, the Sole Source letters, and whether plaintiffs had intentionally withheld documents. Dkt. 205. On January 3, 2019, a new lawyer, Stacy Lyn Weiss, Esq., who had recently filed a notice of appearance on behalf of defendants, Dkt. 197, and claimed experience in liquor licensing, Dkt. 206, filed a letter opining that neither DiMarco nor Barter House had had the proper alcohol license to distribute Blue Hour Tequila or to enter into the Distribution Agreement, *id.* On January 4, 2019, defendants filed an additional letter containing a report that purported to forensically analyze the Florida Sole Source letter and found it doctored. *See* Dkt. 207-1. Defendants also again requested that plaintiffs be ordered to produce any Sole Source letters. *See* Dkt. 207. Claiming misconduct, defendants asked that plaintiffs and their counsel "be ordered to pay all of Defendants' legal fees and cost[s] incurred to date," *id.* at 3, that sanctions be imposed, all plaintiffs' claims dismissed, and judgment be entered for defendants on their counterclaims, *id.* at 2.

On January 8, 2019, plaintiffs filed a letter stating that they intended to respond to defendants' letters in their reply brief, due January 21, 2019. Dkt. 209. On January 21, 2019, in addition to so responding in their reply brief, Dkt. 213, plaintiffs filed a letter motion alleging a discovery lapse on *defendants*' part, Dkt. 212. Plaintiffs claimed that, at Hopkins' deposition,

they had demanded production of documents about which he testified: Infinity Spirits' license agreement to use the Blue Hour Tequila trademark, and a marketing agreement with EIG that purportedly gave EIG the right to use the brand, but that these had never been produced. *See* Dkt. 212.[9]

> a. *The February 12, 2019 conference and letters preceding it*

On January 22, 2019, the Court scheduled a conference for February 12, 2019, to take up defendants' application to obtain discovery outside the fact discovery deadline and the issues raised in the correspondence. Dkt. 216.

Prior to the conference, on January 25, 2019, plaintiffs filed a letter raising a new issue. They claimed that a representative from Elenteny, a third-party liquor importer, had emailed DiMarco on January 23, 2019, and had reported that:

> We received a threatening call from Brian Hopkins regarding La Hora Azul and are now going to be forced to consult our legal counsel for our next course of action. Because of this we will have to put the remaining La Hora Azul – Blue Hour Tequila Reposado on hold indefinitely until we can review our options.

Dkt. 217-1 (exhibit email). Along the same lines, plaintiffs reported that on January 25, 2019, Ian Crystal, a business associate of Barter House, had received a call from an unidentified individual who asked Mr. Crystal "whether he knows Brian Hopkins"; whether he had a lawyer; and, if so, to provide the name of the lawyer, and then, when Mr. Crystal further questioned the nature of the call, told him to "be careful" and "watch his back." Dkt. 217. Plaintiffs asked that

---

[9] Plaintiffs asserted that these documents were relevant because: (1) Hopkins' rights to the Blue Hour Tequila brand as compared with the representations he had made about it to plaintiffs are relevant to plaintiffs' fraud claim; (2) Hopkins' and his entities' interests in, and rights to, the brand are relevant to piercing the corporate veil; and (3) EIG had made certain representations in its Distribution Agreement, the subject of defendants' counterclaims, about its ownership of, and rights to, the brand. In support, plaintiffs filed declarations from DiMarco, Dkt. 215, and Eric Small, Esq., Dkt. 214.

the Court take up these issues at the upcoming conference and enjoin Hopkins from contacting third parties. *Id.*

Later on January 25, 2019, defendants, per Mr. Oh, filed a letter responding to plaintiffs' request for production of the documents Hopkins had addressed at his deposition and to plaintiffs' claim of threatening phone calls. Dkts. 218, 219. As to the former, defendants argued that plaintiffs' request for documents was belated and retaliatory. Dkt. 218. As to the latter, defendants admitted that Hopkins had called Elenteny and that Mr. Oh had called Mr. Crystal but disputed that the calls had been threatening. *See* Dkt. 219. Mr. Oh's letter also attacked the conduct of lawyers at plaintiffs' law firm, seeking sanctions and reiterating his intention to keep calling third parties. He wrote:

> Brian DiMarco, Barterhouse, and the CKR firm – including every single lawyer at that so-called Law Firm that has touched this case – ***must and will*** be called to task. If this Court continues to sit on its hands and continues to not do ***anything*** about this situation, my client and I ***will*** pursue a multi-million dollar lawsuit against (1) Brian Di[M]arco, (2) his company, Barter House Inc., (3) Ros[]anne Felicello, (4) Michael M[al]oney, (5) Eric Small, and (6) any lawyer at CKR Law who has any kind of substantive involvement in this frivolous case.
>
> As this Court has already held, my client and I are entitled to call up third parties to continue our investigation. We are entirely within our rights to contact companies like Elente[]ny Imports and Evolution Spirits. As the Court once noted, "the investigation never ends[."] Plaintiffs and Counsel do not understand that. Instead, they file letter-motion after letter-motion with the Court, in the hopes of gaining traction on the basis of irresponsible, frivolous and sanctionable positions that have absolutely no basis in reality. And thus far, this behavior has been allowed to stand. ***This. Must. End.*** And now.

*Id.* On January 26, 2019, Ms. Weiss filed a letter reporting that, on January 24, 2019, the day after Hopkins' call, she had also called Elenteny and had spoken with a vice president there, where she had, *inter alia*, "expressed concern [with plaintiffs'] lapse in complying with the liquor laws," mentioned that plaintiffs were under investigation by the SLA, and claimed entitlement to discovery. *See* Dkt. 220. Two days later, on January 27, 2019, defendants, per

Mr. Oh, filed another letter motion to compel production of all Sole Source letters and accompanying email chains and any New York State Liquor Licenses. Dkt. 221. The following day, January 28, 2019, defendants, per Ms. Weiss, filed a letter attaching a letter she had written to plaintiffs' counsel on the same subjects. Dkt. 222.

On January 29, 2019, this Court issued an Order reiterating its intent to use the February 12, 2019 conference to resolve the outstanding disputes. Dkt. 227. On February 11, 2019, the day before the conference, Ms. Weiss filed a letter attaching materials relating to defendants' claim that plaintiffs had improperly done business without a liquor license. Dkt. 237.

On February 12, 2019, the Court held a conference at which it addressed the three issues that had arisen following the close of discovery: (1) defendants' demand for production of Sole Source letters; (2) defendants' claim that plaintiffs' lack of a liquor license breached plaintiffs' contractual obligations; and (3) plaintiffs' requests for documents which production they had sought during Hopkins' deposition. The Court also held argument on the summary judgment motions. *See* Feb. 12, 2019 Hrg. Tr.

As to the Sole Source letters, the Court questioned plaintiffs' counsel about whether plaintiffs had conducted a diligent search for such letters during discovery. *See id.* at 85–87. Plaintiffs represented that they had done a diligent electronic and hard copy search and referred the Court to the Small Declaration, Dkt. 214, on this point, *see* Feb. 12, 2019 Hrg. Tr. at 86–87. Plaintiffs represented that the only Sole Source letter these efforts had found was the one produced in their initial production, and which was a subject of a defense counterclaim. *Id.* at 86.

As to the liquor license, the Court authorized plaintiffs to submit a legal memorandum addressing the issues raised by defendants in their letters, to enable the Court to consider this question to the extent relevant to summary judgment. *Id.* at 74. Plaintiffs later did so.[10]

As to the license agreement which Hopkins had identified at his deposition,[11] the Court ordered that it be produced, after addressing its relevance with plaintiffs' counsel and confirming that plaintiffs had timely sought this agreement during fact discovery. *Id.* at 87–88.

Finally, at the conference, the Court directed defendants to cease calling third parties and making representations about plaintiffs' liquor license. *See id.* at 88–91. The Court expressed concern that defendants appeared to be using such calls to harm plaintiffs' business.

    b.  *Post-conference disputes*

      i.  License Agreement

On February 28, 2019, plaintiffs filed a letter stating that defendants had not yet produced the license agreement, referenced at Hopkins' deposition, that the Court had ordered produced. Dkt. 245. On March 1, 2019, defendants filed a letter stating that Mr. Oh had been traveling and could not respond. Dkt. 246. On March 4, 2019, Mr. Oh filed a letter "tak[ing] exception" to the Court's Order at the February 12, 2019 hearing to produce the agreement, demanding "re-hearing and re-argument," or, "at a minimum, a written order with a reasoned basis for the production of this entirely irrelevant document." Dkt. 247. "Barring that," Mr. Oh's letter stated, "we refuse to produce it." *Id.*

---

[10] On February 20, 2019, plaintiffs filed a supplemental brief. Dkt. 240. On February 22, 2019, the Court denied defendants' request to file a formal brief in response, Dkt. 243, while stating that it would consider defendants' responsive letter, Dkt. 241, and earlier letters on the issue, *see* Dkt. 243 (citing, *e.g.*, Dkts. 191, 196, 206, 207, 211).

[11] At the hearing, plaintiffs withdrew their request for the marketing agreement addressed at the deposition. *Id.* at 87.

On March 5, 2019, the Court issued an Order resolving, *inter alia*, this issue. Dkt. 248 ("March 5, 2019 Order"). The Court termed defendants' characterization of the hearing "grossly incorrect," *id.* at 12, canvassed the letter submissions on this issue, *see id.* at 12–14, explained why the agreement was relevant, and restated the reasons for production that the Court had articulated during the hearing, *id.* at 15. Finding its Order at the hearing "unequivocal and clear," the Court ordered defendants to produce the agreement and to file it on the public docket by March 8, 2019. *Id.* at 14–15. The Court ordered sanctions of $200 per day for both Hopkins and Mr. Oh for any failure to comply.

On March 13, 2019, defendants filed a redacted copy of the agreement. Dkt. 254. Mr. Oh "acknowledge[d]" that it had been due earlier, but claimed that because of travels relating to another action, he had not been able to file it before then. *Id.* On March 22, 2019, the Court, *inter alia*, ordered defendants to email a copy of the agreement in unredacted form to the Court by March 27, 2019, and to attach a letter explaining in greater detail the bases for the redactions. Dkt. 258 ("March 22, 2019 Order") at 4–5. The Court also ordered Mr. Oh, by March 27, 2019, to file a sworn declaration, setting out why it had been impossible to produce it earlier. *Id.* at 5. On March 27, 2019, Mr. Oh filed such a declaration. Dkt. 261. Based on his representations, the Court excused him and Hopkins from the sanctions imposed by the March 5, 2019 Order. Dkt. 263.

ii.     Contacts With Third Parties

On February 28, 2019, by letter, plaintiffs represented that they were "continuing to receive reports and inquiries from their business counterparties regarding contact from representatives of Mr. Hopkins, including his Canadian counsel," and that plaintiffs themselves had received written communications from Hopkins' Canadian counsel "concerning this Court's rulings." Dkt. 245; *see also* Dkt. 257-1 (copy of one such communication). On March 4, 2019,

defendants responded that "Canadian counsel are not subject to the jurisdiction of this Court. They are not subject to any Order issued by this Court, formal or informal, nor can they be. Period. End of story." Dkt. 247.

In the March 5, 2019 Order, the Court addressed this issue. The Court found that there had been "a history of harassing conduct by defendants and their counsel in this case, Mr. Oh and Ms. Weiss, against both plaintiffs and plaintiffs' business counterparties." March 5, 2019 Order at 16; *id.* at 17–18 (detailing history).[12] The Order stated that, to the extent Canadian counsel represents a defendant before this Court, counsel, as an agent of that defendant, is bound by this Court's orders. *Id.* at 16. The Court therefore ordered the following:

> Although it should at this point be abundantly clear, the Court, for avoidance of any remaining doubt and to avoid any further controversies and entanglements, hereby **ORDERS** that Infinity Spirits LLC, EIG, and Brian Hopkins and their agents are enjoined from contacting by any means, The Barter House, Inc., Brian DiMarco, and their business counterparties. If defendants wish to investigate or encourage document preservation on the part of plaintiffs' business counterparties, henceforth, they must seek this Court's advance permission. Any contact between defendants and plaintiffs is to be through counsel, and in writing only.

*Id.* at 18.

On April 3, 2019, plaintiffs filed a letter informing the Court that Elenteny had informed them of a Statement of Claim filed against it, on or about March 6, 2019, in the Ontario Superior

---

[12] A particularly disquieting instance of this conduct occurred during this period. On January 28, 2019, Ms. Felicello informed the Court that Mr. Oh had called plaintiffs' law firm, CKR Law, and shouted, cursed at, and threatened a receptionist upon being informed that plaintiffs' attorneys were unavailable. Dkt. 223. Mr. Oh followed the call with a series of profanity-laced emails. *See id.* Ms. Felicello additionally filed declarations from the receptionist in question as well as co-counsel who had been named by Mr. Oh, despite co-counsel's only participation in this case being defending a deposition. *See* Dkts. 224, 225. The Court solicited a sworn declaration from Mr. Oh describing his account of events and advised him to retain independent counsel for a hearing. *See* Dkt. 227. Mr. Oh's declaration acknowledged as truthful the factual allegations in Ms. Felicello's letter. Dkt. 230. On February 6, 2019, the Court held a hearing on Mr. Oh's conduct, enjoined him from "us[ing] profanity or abusive language" or "mak[ing] threats against CKR Law LLP or any of its representatives," and notified Mr. Oh that the Court was referring the matter to the Court's disciplinary committee. Dkt. 232.

Court of Justice by Don Good Tequila S. De R.L. De C.V. Dkt. 264. Plaintiffs attached the Statement of Claim and argued that it violated the March 5, 2019 Order enjoining each defendant and their agents from contacting plaintiffs and their business counterparties. *Id.*

On April 5, 2019, a new co-counsel for defendants, Tom Fini, Esq., responded by letter. Dkt. 268. He argued that the March 5, 2019 Order had not imposed an anti-suit injunction but had only barred counsel from directly contacting and harassing business parties. To the extent the Court contemplated an additional anti-suit injunction, defendants asked for leave to brief that issue.

### iii.  Sole Source Letters

On March 14, 2019, defendants filed a letter reporting a document "recently obtained through informal channels by persons who are not subject to this Court's jurisdiction." Dkt. 253. It purported to certify that Blue Hour Tequila is the brand owner of three different "La Hora Azul" tequilas, to confirm the appointment of Barter House as Blue Hour Tequila's sole United States agent, and to authorize Barter House to file all documents necessary to qualify the brand for sale in all 50 states. Dkt. 253-1. The document is undated and appears to bear Hopkins' signature. *Id.* Defendants' letter accused DiMarco of forging Hopkins' signature on this letter; alleged that "there are many more forged documents and documents containing material misrepresentations" by DiMarco; claimed to possess "over 100 more documents" revealing DiMarco's alleged "illegal[] distribut[ion]" scheme, none produced during discovery; and sought a finding of spoliation. *Id.*

On March 18, 2019, plaintiffs responded. Dkt. 256. Plaintiffs argued that "the purported evidence offered by defendants in inadmissible form does not provide evidence of forgery and defendants do not provide any evidence suggesting that any such letter was used against

defendants' interests." *Id.* at 2. Plaintiffs further referred the Court to their discussion in their reply brief to defendants' claims of forged Sole Source letters. *Id.*

On March 20, 2019, defendants filed a letter stating that the "informal channels" that had resulted in their receipt of these documents entailed "Canadian counsel contact[ing] the Connecticut distributor that Barter House dealt with and, thereafter, the Connecticut liquor board contact[ing] Mr. Hopkins." Dkt. 257. The letter attached materials defendants stated had been "freely provided" to them by the Connecticut liquor board and the Connecticut distributor. *Id.* These included two letters from the Connecticut distributor, Brescome Barton, to defendants' Canadian counsel, responding to correspondence that was not attached. The first, dated February 26, 2019, states that it refers to a letter from Canadian counsel dated February 22, 2019, and that "[t]he deadline of February 26, 2019 at 4:00 p.m. to respond imposed by your letter has made it difficult to gather all of the information *demanded* by you." Dkt. 257-5 at 1.[13]

In its March 22, 2019 Order, the Court summarized the state of play as to the Sole Source letters. March 22, 2019 Order at 5–7. It noted, *inter alia*, that the allegedly doctored Sole Source letter formed the basis for one of EIG's counterclaims; that defendants had written at least five letters on this issue following the close of fact discovery; that during the February 12, 2019 hearing, the Court had questioned plaintiffs' and defendants' counsel on the record about the issue; and that the Court had informed defense counsel, at that hearing, that "[t]he record is

---

[13] The same letter stated that "[f]ollowing receipt of your letter the Company has learned that Park Street Imports LLC of Miami, Florida is listed with the Connecticut Department of Liquor Control as the supplier/out of state shipper for the [Blue Hour Tequila brands]. This change from Barterhouse to Park Street occurred some time between August, 2017, and June, 2018; Brescome was not notified of the change." *Id.* at 2. The second letter, dated March 11, 2019, purports to respond to an email from Canadian counsel of March 1, 2019. It states, among other things, "I hope that you will require no further information from the Company, as responding to your requests required quite a bit of time from a number of employees." Dkt. 257-6 at 1.

closed. I'm not precluding, once we are headed towards trial, if there is good reason to supplement the record. But summary judgment closed a long time ago, and there is not a basis to supplement it now." *Id.* at 6 (quoting Feb. 12, 2019 Hrg. Tr. at 93). The Court explained that it would not address the newly-raised issues relating to the Sole Source letters further at that time. The Court stated that it would "consider, after deciding the motions for summary judgment, whether there is a basis for further discovery on this issue or for a pretrial hearing on defendants' claim of spoliation." *Id.* at 6–7. But, "[p]ending resolution of the summary judgment motions, the Court [did] not invite any further submissions on these matters." *Id.* at 7.

On May 28, 2019, defendants filed a letter that attached more documents allegedly not produced by plaintiffs during discovery as "additional evidence of spoliation." Dkt. 276.

### 9.    Escrow Dispute

At the February 12, 2019 hearing, during argument, the Court asked Mr. Oh about the defense position regarding plaintiffs' partial motion for summary judgment on the Stake Hold Agreement. *See* Feb. 12, 2019 Hrg. Tr. at 28–37. In that claim, plaintiffs seek recoupment of the money contributed towards DiMarco's stake. In particular, the Court questioned Mr. Oh about the sums plaintiffs claim to have contributed pursuant to that agreement. Mr. Oh acknowledged that there was undisputed evidence of a number of contributions by plaintiffs that defendants had not returned. At the conclusion of that colloquy, Mr. Oh volunteered to put the undisputed sums in escrow:

> THE COURT: . . . Is there any coherent argument for your client to retain under the stake hold agreement the amounts of money that Mr. DiMarco put in?

> MR. OH: Your Honor, without waiver of agreements [as to] the amounts, no. And I would make an offer to actually put that money into escrow.

> THE COURT: All right. I'll take you up on it. By Friday, please, put in escrow three sums that you have acknowledged on behalf of your client were paid. The 50,000, the 4,500, and the 16,156.93.

MR. OH: Your Honor, if I may just make a small request. My client's Canadian. It takes a lot of time.

THE COURT: By a week, let's say a week from today.

MR. OH: By 5 p.m.?

THE COURT: 5 p.m. on February 19.

Look, the remaining dollar amount frankly is the $27,500. I am going to ask your client to put that in escrow too. That does not mean your client is obliged to pay it, but there is more than a substantial argument that that too was money towards this agreement. I am going to ask that [that amount] be put in the escrow as well. It is without prejudice to any claim here. But I think there is enough of a possibility that when push comes to shove that [amount] will be part of the recovery here. I'd like that to be protected as well.

Feb. 19, 2019 Hrg. Tr. at 37–38. After further colloquy and a recess, the Court, at the end of the hearing, again addressed the escrow issue:

THE COURT: . . . One more thing. Mr. Oh, please file a declaration on the docket of this case when the money is placed in the escrow, the $98,000 and change, and please specify in whose custody it is held.

MR. OH: Oh. Just one second, your Honor. We ask if we could have 10 business days. It is going to be put in my account.

THE COURT: Do you have a separate IOLA account?

MR. OH: Yes, I do.

THE COURT: You want 10 business days, which would take us to two weeks from today.

MR. OH: I believe so, yes.

THE COURT: I'll give you two weeks from today to put the $98,000 and change in your IOLA account where it is to be safe and secure. But on that day I want a sworn declaration from you as to the amount of money, where you got it, and where it's being held.

MR. OH: Thank you.

*Id.* at 92.

On February 26, 2019, defendants filed a letter asking the Court to reconsider its ruling, because the ruling had been oral, not written; because it was ostensibly unclear; and because Mr. Oh had purportedly acted without client authorization in offering to put the money in escrow. Dkt. 244. On February 28, 2019, plaintiffs filed a letter in opposition. Dkt. 245.

In its March 5, 2019 Order, the Court addressed the escrow issue. The Court noted that its bench ruling ordering defendants to put money in escrow had been valid notwithstanding the fact that it was made orally; that the terms of the ruling were clear; that defendants, in seeking an extension of the deadline to put the money in escrow, had not disputed is clarity; and that the Court had granted Mr. Oh's requests as to the deadline for putting the money in escrow after Mr. Oh had had an opportunity to consult with Hopkins. *See* March 5, 2019 Order at 2, 7. The Court therefore ordered Hopkins to deposit $98,156.98 into Mr. Oh's IOLA attorney account by March 11, 2019, and Mr. Oh to file a declaration that day confirming the deposit. *Id.* at 7–8. The Court provided for self-executing sanctions of $200 per day for Hopkins and Mr. Oh for noncompliance. *Id.* at 8.

## 10. Interlocutory Appeal

On March 8, 2019, defendants filed an interlocutory appeal from the March 5, 2019 Order. Dkt. 251. The Notice of Appeal stated that, in that Order the Court had:

(1) Issued a preliminary injunction ordering Defendant Brian Hopkins, a citizen and resident of Canada, to place into escrow the amount of $98,156.98 (USD) into the IOLA account of his counsel, Andy S. Oh, Esq., in anticipation of a potential final judgment in favor of Plaintiffs Barter House Inc. and Brian DiMarco against an entirely separate entity-Defendant, Infinity Spirits Group, Inc., of which Brian Hopkins is merely the managing director; and

(2) Ordered Defendants to refrain from contacting unidentified "business counterparties" of Plaintiffs, even though such investigation has revealed highly relevant documents that were fraudulently created by Mr. DiMarco and then used by him for illegal purposes, and which were previously brought to Judge Engelmayer's attention on four separate occassions [sic],

including as part of a motion to compel production which the Court has ignored.

*Id.* Defendants also appealed the "Order denying a stay dated March 8, 2019, which was issued even before Defendants asked for a stay." *Id.*[14]

On June 6, 2019, the Second Circuit granted defendants' motion to hold the interlocutory appeal in abeyance pending this Court's decision on Hopkins' motion for reconsideration of the escrow order. Dkt. 279; *see also infra* pp. 32–33.

### 11. Motion for Recusal

On March 14, 2019, defendants moved for this Court's recusal due to alleged bias against Mr. Oh and Hopkins. Dkt. 255. On March 18, 2019, plaintiffs opposed the motion. Dkt. 256.

In its March 22, 2019 Order, the Court denied the motion for recusal. March 22, 2019 Order at 2. The Court noted that:

> A judge considering disqualification must balance the need for "public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over the case." [*In re*] *Drexel* [*Burnham Lambert, Inc.*], 861 F.2d [1307,] 1312 [(2d Cir. 1988)]. A district judge is therefore "as much obliged not to recuse [himself] unnecessarily as [he] is obliged to recuse [himself] when necessary." *In re Certain Underwriter*, 294 F.3d 297, [3]03 (2d Cir. 2002) (quotation marks and citation omitted).

*Id.* After reviewing various of its rulings—some favoring the defense, some not—the Court stated that "a full record of its handling of [the disputes in this case] reflects appropriate judiciousness. The Court is confident that it is unbiased in both fact and appearance." *Id.* at 4.

### 12. Motion for Reconsideration

On April 3, 2019, new counsel, Mr. Fini, appeared for Hopkins. Dkt. 265. By letter, Mr. Fini stated that he had, thus far, been retained only to address the contempt sanctions imposed in

---

[14] This notice of appeal, Dkt. 251, was defendants' second; the original, Dkt. 249, was rejected as procedurally defective. In between, the Court issued its Order, Dkt. 250, stating that the escrow order would not be stayed pending appeal.

connection with the escrow order. Dkt. 266. He argued that because Mr. Oh had acted on his own, without client authorization, when he volunteered to put his clients' funds in escrow to assure that money was safeguarded to protect plaintiffs' ability to recoup the funds they had contributed under the Stake Hold Agreement but which had never been returned, a conflict of interest now arose between defendants and their attorney, Mr. Oh, as to the escrow issue. *Id.* at 1 n.1. Mr. Fini, making additional factual representations, moved for reconsideration of the escrow order. *Id.* at 1. Mr. Fini attached declarations from Hopkins and Mr. Oh in support. *See* Dkt. 266-1 (Oh declaration); Dkt. 266-2 (Hopkins declaration).

On April 26, 2019, plaintiffs filed a letter in opposition. Dkt. 270. On May 9, 2019, the Court, on a motion from Hopkins, authorized each side to file an additional letter. Dkt. 273. On May 15, 2019, Hopkins filed such a letter, Dkt. 274, with an additional declaration from Hopkins, Dkt. 274-1. On May 17, 2019, plaintiffs filed an additional letter. Dkt. 275.

On May 28, 2019, without invitation, Mr. Oh filed a letter responding to plaintiffs' May 17, 2019 letter on behalf of EIG and Infinity Spirits. Dkt. 276. On May 29, 2019, plaintiffs responded to Mr. Oh's letter. Dkt. 277.

## II. Legal Standards Applicable to Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to

support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not grant judgment as a matter of law for one side or the other, but must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 435 (S.D.N.Y. 2016) (internal quotations omitted).

### III. Discussion

Defendants seek summary judgment on all of plaintiffs' claims. *See* Def. Mem. at 5–11. Defendants originally pursued summary judgment both on the merits and on the grounds that personal jurisdiction over them is lacking, *see id.* at 8–9, but, during briefing, abandoned their argument as to personal jurisdiction, *see* Def. Reply at 6 n.4. Defendant EIG further seeks summary judgment as to liability on its counterclaim for breach of the Distribution Agreement. Def. Mem. at 4–5.

Plaintiffs, for their part, seek partial summary judgment as to liability on their claim for breach of the Stake Hold Agreement. *See* Pl. Mem. at 13–14.

## A. Personal Jurisdiction

In the interest of completeness, the Court addresses, first, defendants' now-abandoned challenge to personal jurisdiction.

The governing legal standards are familiar. "[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

To make out a *prima facie* case of personal jurisdiction, whether based on general or specific personal jurisdiction, plaintiffs must establish both "a statutory basis" for jurisdiction and that exercise of such jurisdiction accords "with constitutional due process principles." *Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 14 Civ. 01568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015) (quoting *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014)). General personal jurisdiction subjects a defendant to suit on all claims. *Id.*; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Specific personal jurisdiction subjects a defendant to suit on only claims that arise from the defendant's conduct in the forum. *Cortlandt*, 2015 WL 5091170, at *2; *see also Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).

General personal jurisdiction in New York courts is exercised pursuant to N.Y. C.P.L.R. § 301. Such jurisdiction is proper when "a company has engaged in such a continuous and systematic course of doing business [in New York] that a finding of its presence [in New York] is warranted." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir.

2014) (internal quotation marks omitted); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000). As for the constitutional requirements for general personal jurisdiction, courts may exercise general personal jurisdiction over foreign corporations only "when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear Dunlop*, 564 U.S. at 919. "[E]xcept in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016).

To meet the requirements for specific jurisdiction, a defendant must satisfy the requirements of both New York's long-arm statute and of constitutional due process. *See State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 887 (S.D.N.Y. 2017). New York's long-arm statute identifies four categories of conduct that can justify exercise of personal jurisdiction over a defendant. *See* N.Y. C.P.L.R. § 302(a). Relevant here, under the fourth category, a defendant that "transacts any business within the state or contracts anywhere to supply goods or services in the state" is subject to the jurisdiction of New York courts. *Id.* § 302(a)(1). "To establish personal jurisdiction under § 302(a)(1), two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Barrett v. Tema Development (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007) (internal citation omitted). Thus, "jurisdiction is proper even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quotation marks and citations omitted); *see also Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("[W]here there is a showing

that business was transacted, there must be a 'substantial nexus' between the business and the cause of action." (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59–60 (2d Cir. 1985))). It is possible for a single transaction to satisfy the requirements for specific personal jurisdiction under § 302(a)(1), so long as it is purposeful. *See Franklin v. X Gear 101, LLC*, No. 17 Civ. 6452 (GBD) (GWG), 2018 WL 3528731, at *6 (S.D.N.Y. July 23, 2018). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg*, 9 N.Y.3d at 380.

Significant here, "[p]ersonal jurisdiction, unlike subject-matter jurisdiction, can . . . be purposely waived or inadvertently forfeited." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011). "The actions of the defendant may amount to a legal submission to the jurisdiction of the court . . . ." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites des Guinee*, 456 U.S. 694, 704–05 (1982). "'To waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking.'" *Corporacion Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploracion y Produccion*, 832 F.3d 92, 102 (2d Cir. 2016) (quoting *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)).

Here, plaintiffs allege that personal jurisdiction exists over defendants on a variety of grounds. As to Infinity Spirits, plaintiffs alleged that it is a Massachusetts corporation that contracted with DiMarco in New York. *See* FAC ¶ 15. As to the two Ontario defendants, EIG and Hopkins, plaintiffs assert that personal jurisdiction exists over them through New York's

long arm statute, insofar as they projected themselves into New York by contracting with plaintiffs to distribute Blue Hour Tequila in New York, thereby purposefully availing themselves of the benefits and protections of New York law. *See* Pl. Mem. at 7–8; *George Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 653–54 (1977) (finding purposeful availment in breach of contract action where contract demonstrated purposeful creation of a continuing relationship with a New York corporation).[15]

While these allegations appear amply sufficient to support personal jurisdiction, the decisive point is that defendants here clearly waived personal jurisdiction. Defendants did not move to dismiss for lack of personal jurisdiction. And while both answers by defendants asserted—among a long list of defenses that they purported to preserve—a lack of personal jurisdiction, no defendants thereafter pursued relief on this ground until their summary judgment motion. In their opening brief in support of those motions, defendants argued that, notwithstanding their inactivity on this front and their affirmative pursuit of counterclaims, they are free now to seek summary judgment on the grounds of a lack of personal jurisdiction and insufficient service of process. *See* Def. Mem. at 8–9. But, in defendants' reply brief, they abandoned this argument, stating: "Given the strength of our Counterclaim, we hereby withdraw our argument based on lack of personal jurisdiction." Def. Reply at 6 n.4. Although the analysis differs subtly by defendant, on these facts, the waivers by all three defendants are clear.

As to Infinity Spirits, the first defendant to appear in this case, it waived the defense of personal jurisdiction by filing a Rule 12(b) motion that did not include this defense. "As a

---

[15] Plaintiffs further note that, although a clause in the Distribution Agreement designates Ontario as the venue for enforcement of that contract, their claims are not based on the Distribution Agreement, which is implicated by this litigation only insofar as the Court, over plaintiffs' objections, granted EIG's motion to add counterclaims. Dkt. 103.

general matter, a defense under Rule 12(b)(2) is waived if it is 'not included in a preliminary motion under Rule 12 as required by Rule 12(g).'" *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1499185, at *5 (S.D.N.Y. Mar. 31, 2015) (quoting Charles Alan Wright & Arthur R. Miller, 5C Fed. Prac. & Proc. Civ. § 1391 (3d ed.)). "[A] party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). "A party waives any defense listed in Rule 12(b)(2)–(5) by . . . omitting it from a motion in the circumstances described in Rule 12(g)(2)." *Id.* 12(h)(1)(A). "Taken together, Rules 12(g) and 12(h) provide that a party waives its Rule 12(b)(2) defense if it previously made a Rule 12(b) motion, the Rule 12(b)(2) defense was available to the moving party at that time, and the moving party omitted that defense from its motion." *Laydon*, 2015 WL 1499185, at *5.

These principles compel a finding of waiver here. On December 1, 2017, after removing to this Court, Infinity Spirits filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim. *See* Dkts. 3–4. Infinity Spirits did not, however, raise personal jurisdiction, although the arguments that Infinity Spirits later made were clearly available to it then, as Infinity Spirits, in removing to this Court based on diversity of citizenship, had represented that Infinity Spirits' members both resided in Canada. *See* Dkt. 1. Infinity Spirits has therefore waived the defense of personal jurisdiction under Rules 12(g) and 12(h).

As to Hopkins and EIG, plaintiffs added Hopkins and EIG (plus DGT, which has since defaulted) as defendants on January 16, 2018, through the filing of the FAC. *See* Dkt. 16. On April 5, 2018, plaintiffs filed an affidavit of service representing that the Clerk of Court had served Hopkins and EIG on March 5, 2018, pursuant to Rules 4(h)(2) and 4(f)(2)(C)(ii), and attaching a FedEx signed delivery confirmation. *See* Dkt. 45. On the basis of that affidavit, the

Clerk of Court, on April 6, 2018, issued certificates of default against Hopkins and EIG. Dkts. 48, 50. After plaintiffs moved for default judgment on June 11, 2018, Dkts. 59–62, counsel appeared for Hopkins and EIG to oppose that motion and vacate the certificates of default, Dkts. 68–69. The Court, at a default judgment hearing, granted EIG and Hopkins' motion to vacate the certificates of default but noted that these defendants' record of willful conduct did not compel that outcome. The Court stated that "the reason I am electing not to enforce default judgment [is] based on my understanding that your clients were coming to New York to cooperate with the litigation in this case on the merits." Dkt. 97 at 15. On August 6, 2018, Hopkins and EIG answered, reciting the affirmative defense of lack of personal jurisdiction. Dkt. 88 at 7. They did not, however, move to dismiss. And, on August 30, 2018, as discovery continued, the Court, over plaintiffs' objections, granted EIG leave to amend its answer to include counterclaims involving the Distribution Agreement. Dkt. 103. In EIG's amended answer, even while pursuing counterclaims, it included the affirmative defense of lack of personal jurisdiction. Dkt. 104 at 7.

The Court therefore holds that, notwithstanding the affirmative defenses asserted by Hopkins and EIG in their respective answers, they had—even before abandoning this defense in their reply brief in support of summary judgment—waived the defense of personal jurisdiction. At the threshold, in contesting default, they could have appeared in this Court solely to contest this Court's jurisdiction. Instead, in opposing default, they both pressed to defend the case on the merits here. Later, at the time of their answers, they could have moved for dismissal under Rule 12(b)(2). Or they could have done so at the time that EIG sought and was granted leave to amend to add counterclaims. Instead, however, EIG affirmatively availed itself of the resources of this Court, seeking—and being granted—the right to add *additional* claims to this litigation.

At this point, discovery has concluded. The extended procedural history of this case, recounted above, is testament to the considerable resources expended by the parties and this Court in litigating it in this forum. This history has consequences for a defendant who, at this late date, proposes to defend on grounds on lack of personal jurisdiction. Hopkins and EIG "participated in pretrial proceedings but never moved to dismiss for lack of personal jurisdiction despite several clear opportunities to do so . . . ." *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 62 (2d Cir. 1999), *cert. denied*, 530 U.S. 1244 (2000). "These circumstances establish a forfeiture." *Id.* (citing *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167 (1939) (personal jurisdiction defense "may be lost by failure to assert it seasonably"); *see also Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (personal jurisdiction defense lost where defendants "participated in lengthy discovery, filed various motions and opposed a number of motions" and "fully participated in litigation of the merits for over two-and-a-half years without actively contesting personal jurisdiction").

Notably, in *Hamilton*, the Second Circuit held that *allowing* a motion to dismiss for lack of personal jurisdiction on the eve of trial after it had never before been made "exceed[ed] the bounds of allowable discretion." *Id.* at 62–63. Here, while raising the affirmative defense in an answer without making a motion "literally complie[s] with Rule 12(h)," making the motion after discovery and the expenditure of significant resources did "not . . . comply with the spirit of the rule, which is to expedite and simplify proceedings in the Federal Courts." *Cont'l Bank*, 10 F.3d at 1297 (quotation marks and citations omitted). "[D]efendants' delay in urging this threshold issue manifests an intent to submit to the court's jurisdiction." *Id.* (citations omitted).[16]

---

[16] The cases that defendants cited when initially contesting waiver are plainly inapposite. *See* Def. Mem. at 9 n.5. *Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*, No. 00 Civ. 201 (JSM), 2001 WL 1041990 (S.D.N.Y. Sept. 7, 2001), relied on the fact that "Plaintiff was on

The Court thus holds that, even had defendants not abandoned their motion for summary judgment based on a lack of personal jurisdiction, any such motion would have been denied, on grounds of waiver.

### B.     EIG's Counterclaim for Breach of Contract

EIG seeks summary judgment on its breach of contract counterclaim. Def. Mem. at 4–5; Def. Reply at 4–6.[17] That counterclaim alleges that Barter House breached the Distribution Agreement by failing to order a minimum amount of Blue Hour Tequila, failing to promote it, and illegally importing it into Florida. EIG Answer at 13–14. EIG argues that the undisputed facts demonstrate that Barter House failed to contribute its required share of the marketing expenses, violated the exclusivity provision by attempting repeatedly to distribute the brand in states other than New York, and failed to order 500 cases as required upon execution of the Distribution Agreement. *See* Def. Mem. at 4–5. In an argument made for the first time in their reply, defendants separately argue, based on ostensibly new evidence, that "Plaintiffs breached the Distribution Agreement as soon as they signed, because ***they never had the proper*** license to

---

notice that Defendant intended to make this motion" based on conferences with the Court and counsel when allowing a belated motion to dismiss for lack of personal jurisdiction, *id.* at *4. Here, in contrast, plaintiffs and the Court were under no such impression. The possibility of such a motion was first raised by Mr. Oh after the close of fact discovery. As for *Wafios Machinery Corp. v. Nucoil Industries Co., Ltd.*, No. 03 Civ. 9865 (RWS), 2004 WL 1627168 (S.D.N.Y. July 21, 2004), it concerned only the question whether filing a counterclaim waived a personal jurisdiction defense, a fact that, while germane, is not alone dispositive here. Finally, *Babitt v. Frum*, 606 F. Supp. 680 (S.D.N.Y. 1985), concerned a motion in mid-discovery after a delay in filing occasioned by settlement discussions, *id.* at 681–82. These facts are far afield from those here.

[17] EIG, in its answer, brought two counterclaims: against Barter House and DiMarco for breach of contract, and against DiMarco alone for tortious interference with contractual relations. *See* EIG Answer at 13–15. Although defendants in their moving brief reference "counterclaims," their arguments address only breach of contract. *See* Def. Mem. at 4–5; Def. Reply at 6 ("These multiple, undisputed and undisputable contract breaches entitle EIG to judgment as a matter of law, without a trial, on its Counterclaim for breach of contract."). The Court, accordingly, construes EIG as seeking summary judgment on only the breach of contract counterclaim.

distribute tequila in the State of New York." Def. Reply at 6. Plaintiffs counter that material disputes of fact preclude granting summary judgment.

The Court holds, with plaintiffs, that material disputes of fact preclude summary judgment on EIG's breach of contract counterclaim. The Court addresses, in turn, each theory of breach claimed by defendants.

First, to the extent defendants claim that Barter House breached the agreement by failing to contribute its share of required marketing expenses, plaintiffs have adduced evidence that Barter House in fact did so. *See* Pl. Counter 56.1 ¶¶ 47–48.

Second, to the extent that defendants rely on Barter House's promotion and distribution of Blue Hour Tequila outside of New York State, important facts are in dispute. The parties dispute, each on the basis of record evidence, whether Hopkins approved sales in states other than New York. DiMarco, at his deposition, testified that defendants expressly asked that Barter House sell defendants' products in Connecticut, Kentucky, and Tennessee, *see* DiMarco Dep. at 57–58, and that Hopkins enthusiastically agreed to facilitate sales in Florida, *id.* at 98–100. There is some documentary corroboration for this claim, including an email from DiMarco to Hopkins about registering Blue Hour Tequila in Florida, Felicello Decl. Ex. 20, and an email from DGT to DiMarco, apparently copying Hopkins, with forms to be used for applying for a license to transport liquor into Kentucky, DiMarco Decl. Ex. 7. And defendants apparently do not dispute that Hopkins provided a Sole Source letter for Tennessee. *See* Def. 56.1 ¶ 16. Defendants do, however, deny that Barter House had authority to distribute Blue Hour Tequila in Florida. They have submitted evidence purporting to show that a Sole Source letter as to Florida was doctored. *See* Dkt. 207. On the present record, therefore, disputes of material fact prevent the Court from resolving whether Hopkins approved sales in states other than New York.

Third, as to the number of cases of Blue Hour Tequila ordered by plaintiffs, it appears undisputed that as of the point at which the parties' business relationship collapsed, Barter House had not ordered the full 500 cases of Blue Hour Tequila that the contract required. The evidence appears to support that Barter House ordered, at most, approximately 430 cases. *See* Pl. 56.1 ¶ 51 (citing evidence to this effect). However, there is a live dispute as to whether the Distribution Agreement required Barter House to order 500 cases immediately or over an extended period. The agreement does not explicitly place a temporal deadline on this duty. *See* Pl. Mem. at 4 (citing Distribution Agreement §§ 4, 5). Further, even assuming that an obligation to purchase the full case volume at some point became a breach, there are significant factual disputes as to which party breached first. In particular, DiMarco, at his deposition, testified that Barter House ordered around $59,000 worth of Blue Hour Tequila, which equated to between 167 and 250 cases, and paid for the order, but that defendants never shipped it. *See* DiMarco Dep. at 80–82. On the summary judgment record, disputes of material fact therefore preclude summary judgment on EIG's claim that Barter House's failure to purchase 500 cases was a material breach.

Finally, as to defendant's late-stage argument regarding Barter House's lack of a liquor license, this argument—even assuming it is properly considered given defendants' reliance on evidence obtained after fact discovery closed—has been a moving target. In her initial submission, Ms. Weiss, the counsel with apparent lead responsibility for litigating this issue, asserted that, to import tequila into the United States, and New York, specifically, Barter House was required to have a New York State Wholesale *Liquor* License. *See* Dkt. 206. But, she asserted, Barter House holds only a New York State Wholesale *Wine* License, and therefore cannot import tequila into the country or state. *See id.* Mr. Oh, in his later submission on this

point, appeared to pivot, after plaintiffs' submissions averred that Barter House had appropriate licenses for importing and distributing tequila. *See* Dkt. 240. Mr. Oh stated: "Whether Barter House was allowed to distribute in New York is not contested, assuming it had the proper license. We have never made that an issue, since, indeed, the Distribution Agreement was all about allowing the sale of the Brand into New York. The issue we have raised is the illegal distribution of the Brand in other states." Dkt. 241.

In all events, the Court holds, plaintiffs' compliance or lack of compliance with state liquor licensure requirements is irrelevant to EIG's counterclaim for breach of contract.[18] As defendants admit, the issue came to their attention deep into this litigation, after the close of fact discovery, during which defendants did not probe this issue. It follows that defendants' current asserted perception that Barter House lacked an appropriate license could not, in real time, have been defendants' basis for terminating the Distribution Agreement in 2017.

Significant too, the Distribution Agreement does not contain any provision requiring Barter House to hold any particular license. And, to the extent defendants claim that a defective or missing license could frustrate the purpose of the agreement, *see* Feb. 12 Hg. Tr. at 57–62, there is no evidence that happened here. Defendants have not adduced any evidence that Barter House at any point experienced legal impediments distributing defendants' products.

---

[18] To the extent any inquiry were to be undertaken, it would instead be for the SLA to determine whether Barter House does or does not possesses the appropriate licenses, and/or whether, as Barter House claims, the licenses of the affiliated entities such as subdistributors with whom it was working satisfied any licensing obligation in connection with its distribution of defendants' liquor. The Court does not opine whether there is any charter to undertake such inquiry. The Court does note that based on the record evidence, the license to which Ms. Weiss pointed— Barter House's New York State Wholesale Wine License—is only one of Barter House's licenses. Barter House also possesses a Federal Alcohol Importer Permit (No. NY-I-15103). *See* Dkt. 240; *see also* List of Alcohol Importer Permit List: North Carolina to New York, Alcohol and Tobacco Tax and Trade Bureau, U.S. Dep't of the Treasury, https://www.ttb.gov/foia/xls/frl-alcohol-importers-nc-to-ny.htm.

To the extent that defendants' argument, instead, rests on plaintiffs' allegedly fraudulent creation and use of Sole Source letters to distribute Blue Hour Tequila to states other than New York, that issue is properly a part of this case, insofar as it is a basis of EIG's counterclaim for breach of contract. However, the Court has already held that disputes of material fact as to that question preclude resolution on summary judgment.

Accordingly, the Court denies EIG's motion for summary judgment on its breach of contract counterclaim.

### C.    Plaintiffs' Claims

Defendants seek summary judgment in their favor on all of plaintiffs' claims. Defendants argue that (1) plaintiffs' fraud claim is unsupported by facts and duplicative of their contract claim; (2) plaintiffs' claim for breach of the Stake Hold Agreement is defective because plaintiffs have not pled or established their complete performance; and (3) plaintiffs' unjust enrichment claim is barred because a valid contract governs the dispute. *See* Def. Mem. at 5–8. Plaintiffs oppose these arguments, and cross-move for summary judgment on their breach of contract claim. The Court addresses each claim in turn.

### 1.    Breach of Contract

The parties make reciprocal summary judgment motions as to plaintiffs' claim for breach of the Stake Hold Agreement. Plaintiffs argue that defendants' undisputed retention of the money that DiMarco contributed, or which was contributed on his behalf, under that agreement entitles him to summary judgment. Defendants seek summary judgment in their favor on the same claim based on what they assert is DiMarco's failure to allege and establish complete performance. For the following reasons, the Court denies both motions, finding that disputes of material fact preclude a grant of summary judgment to either side.

Under New York law, an action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). It is undisputed that DiMarco and Infinity Spirits entered into the Stake Hold Agreement in January 2017; that the Stake Hold Agreement required DiMarco to pay $250,000 in exchange for a 2.5% equity share in Infinity Spirits; and that the Stake Hold Agreement did not contain a deadline by which DiMarco's $250,000 payment was due. It is also undisputed that DiMarco paid some amount of that money, but that the relationship between DiMarco and Hopkins disintegrated in mid-2017,[19] with the result that DiMarco neither received the money back nor the promised equity share. The parties dispute the legal significance of the fact that DiMarco paid some

---

[19] Although defendants initially claimed that defendants never terminated the Stake Hold Agreement, Def. Reply at 8, they acknowledged during argument that the parties' business relationship had terminated before the deadline for DiMarco to put up the money required by that agreement:

> THE COURT: You agree as well with [Ms. Felicello] that by April 17, [2017,] it was plainly apparent to both Brians, DiMarco and Hopkins, that any form of the business relationship had exploded and was over.

> MR. OH: Correct, your Honor. I accept that.

> THE COURT: Helpful. Prior to that point, is there anything that obliged Mr. DiMarco, prior to that point, to have put up the $146,000 pursuant to the loan agreement? I'm not seeing it.

> MR. OH: Prior to that point. I don't believe so, your Honor.

> THE COURT: So, before any deadline, hypothetically, for Brian DiMarco to put up the money had ripened, the business relationship between the two Brians had disintegrated. Correct?

> MR. OH: Correct, your Honor.

Feb. 12, 2019 Hrg. Tr. at 35–36.

money towards that agreement and that the parties' working relationship never came to fruition. Defendants argue that because DiMarco did not contribute the full $250,000, his performance under the contract was necessarily inadequate, and so he is not entitled to claim breach. Def. Mem. at 7. Plaintiffs argue that Infinity Spirits, via Hopkins, repudiated the contract, resulting in an anticipatory breach by Infinity Spirits that prevented DiMarco from paying the full $250,000, and entitling DiMarco, at a minimum, to his money back. Pl. Mem. at 14; Feb. 12, 2019 Hrg. Tr. at 11.

The doctrine of anticipatory repudiation "relieves the nonrepudiating party of its obligation of future performance and entitles that party to recover the present value of its damages from the repudiating party's breach of the total contract." *Am. List Corp. v. U.S. News & World Rpt., Inc.*, 75 N.Y.2d 38, 44 (1989). "A repudiation can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998) (quotation marks and citation omitted). "The announcement of intention not to perform by the repudiating party must be 'positive and unequivocal.'" *About.com, Inc. v. TargetFirst, Inc.*, No. 01 Civ. 1665 (GBD), 2003 WL 942134, at *4 (S.D.N.Y. Mar. 10, 2003) (quoting *Tenavision, Inv. v. Neuman*, 45 N.Y.2d 145, 150 (1978)).

The pertinent facts here are these. The Stake Hold Agreement is signed by Hopkins, on behalf of Infinity Spirits, and by DiMarco. *See* Stake Hold Agreement. The agreement, on its face, provides for a 2.5% stake hold for DiMarco in exchange for $250,000 USD—the "Total Paid by Di Marco [sic] to [Infinity Spirits.]" *Id.* The face of the document tabulates certain credits

towards this $250,000. "The amount of $50,000USD is held for Di Marco [sic] on the real estate deal in Jalisco, Mexico until April 01, 2017. After April 1, 2017, this amount will be credit[ed] to your share portion." *Id.* That $50,000 refers to an amount already wired by Barter House to EIG for the acquisition of a distillery and hacienda that never went through. *See* Pl. 56.1 ¶¶ 34–40; Hopkins Dep. at 105–07. A table in the agreement identifies an additional $53,399.93 that would count towards DiMarco's portion, $16,156.93 of which, it recites, was paid on November 15, 2016, and a balance of $37,243 is due by January 25, 2017, by wire. *See* Stake Hold Agreement. The agreement states that the remaining "balance of $146,601" (or, more accurately, $146,600.07) "will be prepared in a loan agreement for Di Marco [sic] to sign." *Id.* The Stake Hold Agreement does not, however, specify a date by which the loan agreement is to be prepared or signed. Nor does it set out a date after which, if payment of $250,000 has not by then been completed, the offer to DiMarco of a 2.5% stake hold expires. On the face of the Stake Hold Agreement, therefore, DiMarco had already contributed $66,156.93 at the time of signing.

As to the $37,243, Barter House wired EIG $27,500 on or about January 25, 2017 for an order of Blue Hour tequila. Pl. 56.1 ¶¶ 64–65. Plaintiffs argue, based on Hopkins' deposition, that this was a payment towards the Stake Hold Agreement. *See id.* ¶ 66 (citing Hopkins Dep. at 108). Plaintiffs also represent that, during one of DiMarco's trips to Mexico, on or about February 3, 2017, Barter House gave Hopkins $4,500 for operations in Mexico, to be treated as a payment towards its stake. *Id.* ¶ 67. Defendants dispute whether this additional $32,000 is properly treated as paid under the Stake Hold Agreement. If so, this would bring DiMarco's contribution to $98,156.93.

The record leaves competing inferences, however, explaining the fate of the loan agreement, upon whose execution, under the Agreement, the bulk ($146,601) of DiMarco's

unpaid stake was to be paid by Infinity Spirits. It is undisputed that DiMarco never signed a loan agreement. And defendants have represented that, to their knowledge, a loan agreement was never prepared. *See* Feb. 12, 2019 Hrg. Tr. at 33–35. Defendants conceded at argument that, because defendants drafted the Stake Hold Agreement, it is a logical inference that the contract term stating that a loan agreement "will be prepared" for DiMarco to sign implied that defendants were to prepare the loan agreement. *See id.* at 33–34. The failure to prepare an agreement that was to provide an essential mechanism for DiMarco to complete the payments required for his performance could easily constitute a repudiation on defendants' part. But, because the Stake Hold Agreement does not assign a deadline for the preparation or execution of that loan agreement, the Court cannot conclude unequivocally that defendants in this manner repudiated the agreement by April 2017, when all agree that the overall business relationship between DiMarco and Hopkins and their associated entities disintegrated.

The next relevant date is August 14, 2017. On or about that date, Hopkins, on behalf of EIG, sent Barter House a notice stating that the *Distribution Agreement* was terminated, with the termination retroactively effective as of May 17, 2017. Pl. 56.1 ¶ 68. This notice did not explicitly refer to the Stake Hold Agreement. But the two are interrelated. Indeed, the Stake Hold Agreement appears to provide an opportunity for DiMarco to obtain an additional 2.5% stake hold in Infinity Spirits depending on whether certain goals set under the Distribution Agreement were met.[20] However, the termination of the Distribution Agreement does not itself

---

[20] To this end, the final portion of the Stake Hold Agreement reads as follows:

**0.5% NY Case Movement Earn Out:**
2017—2,500 cases target for 0.2%
2018—3,200 cases target for 0.3%

vitiate the Stake Hold Agreement. The provision enabling DiMarco to add 2.5% based on performance is independent of the investment required for DiMarco's initial 2.5% stake. And termination of the Distribution Agreement by Hopkins would not void plaintiffs' initial 2.5% stake in Infinity Spirits, but would merely close off an avenue to add to that stake. Although the termination of the Distribution Agreement was an event of significance, it was not, necessarily, a positive and unequivocal repudiation of the *Stake Hold Agreement*. Notable too, the letter terminating the Distribution Agreement was sent by Hopkins on behalf of EIG, not Infinity Spirits. Although Hopkins was acting as the representative for each entity, the fact of legally distinct entities complicates finding that termination of the Distribution Agreement was an unequivocal repudiation by another entity of a separate, albeit related, agreement.

Under these circumstances, the Court holds, there is a material dispute of fact as to either theory of breach pursued by plaintiffs: that Hopkins and/or Infinity Spirits (1) breached the Stake

---

**1.0% Territory Earn Out:**
Territory earn out will be based on distribution in the 9 territories listed below under Distribution contract with [Infinity Spirits]. [Infinity Spirits] and team will take care of the expenditures and supply all necessary brand registration, AMP, activations to support the brand through distribution in said territories along with Di Marco [sic].

1. Massachusetts
2. New Hampshire
3. Vermont
4. Maine
5. Pennsylvania
6. Michigan
7. New Jersey
8. Connecticut
9. Rhode Island

**1.0% Management Earn Out:**

Di Marco [sic] will have an earn out of 1.0% stake hold to be the 'Managing Director' for the territories list above for minimum of two full (2) years. [Infinity Spirits] will continue to support in the distribution of the products in these territories to achieve optimum sales and placements.

Stake Hold Agreement at 1–2.

Hold Agreement by failing to prepare the loan agreement, or (2) anticipatorily breached the Stake Hold Agreement by terminating the related distribution agreement. A finder of fact could find either of these breaches. Or it could find neither, finding, perhaps, that there was never a true breach of the Stake Hold Agreement, and instead that, once the parties' broader business relationship soured and the Distribution Agreement was terminated, neither had an interest in finalizing the steps (including execution of a binding loan agreement) needed to give DiMarco a 2.5% stake in Hopkins's company. On such a finding, with the agreement not providing a deadline for preparation of the loan agreement, defendants would not be liable for breach of the Stake Hold Agreement.

To be sure, it is undisputed that DiMarco contributed at least $66,156.93 under the Stake Hold Agreement, and perhaps more, and that he received neither a stake in Infinity Spirits nor his money back. While the Court cannot award DiMarco summary judgment on breach of contract, this circumstance assures that—whether under a contract or quasi contract theory—DiMarco will therefore ultimately be entitled to recoup at least the amount he is found to have contributed towards the Stake Hold Agreement.

Because a jury could find either that defendants did or did not breach or repudiate the Stake Hold Agreement, the Court denies both sides' motions for summary judgment on this claim.

### 2. Unjust Enrichment

As an alternative route to obtaining the return of the monies that plaintiffs paid to defendants, including under the Stake Hold Agreement, plaintiffs pursue an unjust enrichment claim, challenging defendants' retention of these monies. Defendants seek summary judgment on that claim, on the ground that it is legally barred by the existence of a valid contract, *i.e.*, the Stake Hold Agreement. Plaintiffs counter that the law permits them, at this stage, to pursue

contract and unjust enrichment claims in the alternative. Separately, plaintiffs argue, certain payments that they made to defendants were separate from both the Stake Hold Agreement and the Distribution Agreement.

"To establish unjust enrichment, the plaintiff must demonstrate: '(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" *Global Packaging Svcs., LLC v. Global Printing & Packaging*, 248 F. Supp. 3d 487, 498 (S.D.N.Y. 2017) (quoting *Mahoney v. Endo Health Sols., Inc.*, No. 15 Civ. 9841 (DLC), 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016)). The doctrine as to when contract and quasi contract claims may be pursued together is familiar. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. LIRR*, 70 N.Y.2d 382, 388 (1987) (citing *Blanchard v. Blanchard*, 201 N.Y. 134, 138 (1911)). However, "where rescission of a contract is warranted, a party may timely rescind and seek recovery on the theory of quasi contract." *Id.* at 389 (citing *Soviero Bros. Contr. Corp. v. City of New York*, 142 N.Y.S.2d 508 (1st Dep't 1955), *aff'd* 2 N.Y.2d 924 (1957)). Only "where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties" is it impermissible to seek damages in an action sounding in quasi contract. *Id.* (citations omitted).

Here, defendants' theory for summary judgment is defeated by the very arguments they make against plaintiffs' breach of contract claim. As reviewed above, there is a dispute of material fact whether (1) defendants repudiated the Stake Hold Agreement, resulting in breach; or (2) there was no breach, but with neither party fully performing or desirous of doing so, there

has been a rescission of the contract with plaintiffs entitled to damages in quasi contract.

Defendants have not articulated a theory under which defendants would be entitled to keep the payments made to Infinity Spirits by plaintiffs; on the contrary, as noted, at argument, defense counsel, in offering to put money in escrow, acknowledged that plaintiffs will be entitled—on some theory—to return of the money they contributed. However, disputes of material fact prevent the Court from determining which theory applies. Were a jury to hold that Infinity Spirits breached or repudiated the Stake Hold Agreement, recovery would then be in contract; were a jury to hold that there was no breach or repudiation, then plaintiffs would be entitled to pursue—and obtain—damages through quasi contract.

Independently, plaintiffs' unjust enrichment claim covers—in addition to amounts paid under the Stake Hold Agreement—sums plaintiffs claim to have paid to defendants outside of that agreement to promote the Blue Hour tequila brand. *See* FAC ¶¶ 86–88. These include the organization of an event in Central Park in April 2017, for which Barter House incurred $15,000 in expenses, as well as other events used to promote Blue Hour Tequila. *See* Pl. Counter 56.1 ¶¶ 47–48. To the extent payments of this nature are found, plaintiffs' unjust enrichment theory is viable, precluding summary judgment for defendants. At the same time, summary judgment on this claim is not available to plaintiffs, and plaintiffs have not sought summary judgment on it, because the factual record is not conclusive as to the nature of and purposes served by particular payments. While a jury could find the payments to have been made to promote the Blue Hour Tequila brand in anticipation of a business collaboration with defendants that did not come to pass, a jury could also find the payments to have been made for other purposes as to which a theory of unjust enrichment may or may not be available depending on the factual context. Some of these payments could also be found to have been within the scope of the Stake Hold

Agreement, as to which the theory of recovery on which plaintiffs are entitled to prevail (*i.e.*, contract versus quasi contract) is as yet undetermined.

Defendants' motion for summary judgment dismissal of plaintiffs' unjust enrichment claim is, accordingly, denied.

### 3.     Common Law Fraud

Defendants, finally, move for summary judgment on plaintiffs' fraud claim on the grounds that it is (1) duplicative of the breach of contract claim in which plaintiffs claim a breach of the Stake Hold Agreement and (2) unsupported by facts developed in discovery. *See* Def. Mem. at 5–7. Neither argument has merit.

First, the fraud claim does not duplicate the breach of contract claim. The breach of contract claim concerns the Stake Hold Agreement. The fraud claim involves representations that defendants allegedly made promising equity interests to plaintiffs in various entities and about plaintiffs' participation in the launch and promotion of Blue Hour Tequila. FAC ¶¶ 76–77. Although the fraud claim may have a degree of factual overlap with the breach of contract claim, the representations plaintiffs claim were false and fraudulent concerning (1) the launch and promotion of Blue Hour Tequila or (2) a potential equity interest for plaintiffs (other than the stake in Infinity Spirits covered by the Stake Hold Agreement) are not addressed by that claim.

Second, the facts adduced in discovery supply a factual basis for the fraud claim. "Under New York law, fraud requires proof of (1) a material misrepresentation or omission of fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiffs, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d

553, 559 (2009); *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996)).[21] At a minimum, the evidence adduced in discovery would support a fraud claim, at least with respect to defendants' representations to plaintiffs with regard to the potential acquisition of the Mexican hacienda. DiMarco testified at his deposition that Hopkins made statements to DiMarco and his business partners to the effect that they would be investing in an hacienda, tequila distillery, hotel, and theme park. *See* DiMarco Dep. at 153–54. It is undisputed that Barter House sent $50,000 to EIG for the transfer. Pl. 56.1 ¶ 38. Hopkins then apparently credited that amount to the Stake Hold Agreement. It is, further, undisputed that neither the purchase of the hacienda nor the stake hold ever occurred, and that the $50,000 was never returned to Barter House or DiMarco. Pl. Counter 56.1 ¶¶ 71, 73. On the facts adduced, a jury could find fraudulent intent on Hopkins' part and justifiable reliance on plaintiffs'. To be sure, a jury could find against plaintiffs, including on the ground to which defendants point: that DiMarco, who admits developing early on a sharply negative assessment of Hopkins' honesty and character, could not have reasonably relied on Hopkins' representations. Those, however, are questions for the jury, and are not properly resolved by the Court at this stage, as it is "a rare circumstance in which the issue of reasonable reliance can be resolved at the stage of summary judgment." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 484 (S.D.N.Y. 2018).

---

[21] Although defendants' opening brief in support of summary judgment invoked the heightened pleading standard of Federal Rule of Civil Procedure 9(b), *see* Def. Mem. at 5 n.4, they appear to have abandoned that argument in their reply papers, Def. Reply at 7–8, and for good reason. "The specificity requirements of Fed. R. Civ. P. 9(b) have been imposed to ensure that a defendant is apprised of the fraud claimed in a manner sufficient to permit the framing of an adequate responsive pleading. A party who fails to raise a 9(b) objection normally waives the requirement." *Todaro v. Orbit Intern. Travel, Ltd.*, 755 F. Supp. 1229, 1234 (S.D.N.Y 1991) (quotation marks and citations omitted); *Heil v. Lebow*, No. 91 Civ. 8656 (JFK), 1993 WL 14032, at *3 (S.D.N.Y. Jan. 13, 1993). Here, defendants have waived a Rule 9(b) objection by not raising it in their answers or at any time before moving for summary judgment.

The Court therefore denies defendants' motion for summary judgment on the fraud claim.

**D.   Escrow Issue**

Finally, the Court resolves Hopkins' motion for reconsideration of the Court's oral and written orders requiring Hopkins to pay $98,156.98 into escrow.

The Court was impressed by the arguments of defendants' new counsel, Mr. Fini. The Court accepts the factual representations contained in the affidavits of defendant Hopkins and defense counsel Mr. Oh to the effect that Mr. Oh never had authority to offer to put Hopkins' funds into escrow and that he acted *ultra vires* and in contravention of his client's directives in doing so. Nor did Mr. Oh have authority to bind the other defendants in this case. The Court accordingly grants Mr. Fini's motion, Dkt. 266, and vacates its February 12, 2019 oral Order on the escrow issue and its March 5, 2019 Order, Dkt. 248, as well as the sanctions associated with those orders.

However, a substantial issue is presented as to whether the Court can and should *now* order that funds be put in escrow. As reviewed above, as to the payments that plaintiffs made towards the Stake Hold Agreement, it is clear that plaintiffs will be entitled to recovery of those payments, even though it cannot be determined on summary judgment whether this recovery is properly entered on plaintiffs' breach of contract claim or their quasi contract claim.[22] Under these circumstances, plaintiffs have asked that the Court, in the event that it reconsiders and vacates the earlier escrow award, consider imposition of a new such order. Plaintiffs' application, however, presupposed entry of summary judgment in their favor on the contract

---

[22] Although there is a dispute as to the full amount of these payments, the undisputed facts establish that at least $66,156.93, and perhaps as much as $98,156.93, was paid towards the Stake Hold Agreement.

claim, whereas the Court today cannot do so, but instead can hold only that judgment will be warranted for the funds at issue *either* on that claim or on plaintiffs' quasi contract claim.

The Court accordingly authorizes prompt briefing on the issue whether the Court can and should enter an order directing defendant(s) to put in escrow, for protection of plaintiffs, a sum equal to the recovery that plaintiffs undisputedly contributed towards the Stake Hold Agreement. Any motion from plaintiffs seeking such relief is due four weeks from the date of this Opinion. Defendants' opposition is due two weeks later. The Court authorizes plaintiffs to file a reply, due one week after the due date of defendants' opposition. The Court does not authorize and will not accept a sur-reply. If plaintiffs pursue such relief, they should (1) identify the precise sum that plaintiffs ask be put in escrow; (2) set out the record basis that each of the payments comprising the sum sought was in fact paid, identify the person(s) or entit(ies) from whom and to which that payment was made, and the record basis for contending that that sum was paid pursuant to the Stake Hold Agreement; (3) identify the defendant(s) from whom an escrow payment is sought; and (4) address the Court's legal authority at this stage to issue an escrow order.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment and plaintiffs' cross-motion for partial summary judgment are denied. Hopkins' motion for reconsideration of the Court's escrow orders is granted. The Clerk of Court is respectfully directed to close the motions pending at Dkts. 185, 186, 196, 199, 207, 221, and 266.

The Court above has set out a schedule for briefing a renewed motion seeking an order to put funds in escrow.

This case—barring settlement—will now proceed to trial. The Courts directs that counsel, consistent with the Court's Individual Rules, submit a joint pretrial order, motions *in limine*, requests to charge, and proposed *voir dire* on August 30, 2019. Any oppositions to the motions *in limine* are due September 13, 2019. The Court is prepared to adjourn these deadlines briefly in the event that it receives a *joint* letter from counsel representing either that the parties have agreed to engage promptly in meaningful settlement discussions or are willing to participate in a prompt settlement conference before this Court or a Magistrate Judge. The Court *strongly* encourages counsel to pursue settlement at this juncture. Although defendants are at liberty to task counsel as they see fit to handle settlement discussions, given the history of dealings between Mr. Oh and plaintiffs' counsel in this case, *see, supra* p. 26 n.12, there would appear to be practical wisdom in having new counsel, e.g., Mr. Fini, represent defendants in such discussions.

In the event that the schedule above is not adjourned, the Court will hold a pretrial conference on Tuesday, October 1, 2019, at 10:30 a.m. The Court will use that conference to review the joint pretrial order with counsel; to resolve, to the extent possible, motions *in limine*; and to set a prompt trial date. The Court is also mindful that there remain two outstanding issues for resolution: defendants' claims of spoliation and plaintiffs' claim that defendants violated an Order of this Court through the filing of a Statement of Claim in Ontario. The Court will take up these issues, raised by Dkts. 253, 256, 257, 276, and 264, at the same conference. The Court does not invite, or permit, further submissions on these issues.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: August 5, 2019
       New York, New York